# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

Reporter of Decisions:
Kimberly K. Muschong

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

PEOPLE v KARDASZ

Docket No. 165008. Argued on application for leave to appeal March 12, 2025. Decided December 19, 2025.

Robert J. Kardasz was convicted by a jury in the Macomb Circuit Court of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b). The trial court, Michael E. Servitto, J., originally sentenced defendant to serve 360 to 550 months in prison; the court additionally imposed lifetime electronic monitoring (LEM) under MCL 750.520n and ordered defendant to comply with the requirements of the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. Defendant appealed, and the Court of Appeals, CAMERON, P.J., and CAVANAGH and SHAPIRO, JJ., in an unpublished per curiam opinion issued November 19, 2019 (Docket No. 343545), affirmed his conviction but vacated his sentence and remanded for resentencing because the trial court had exceeded the 25-year statutory minimum sentence without explaining why a 30-year sentence was proportionate. On remand, the trial court resentenced defendant to serve 300 to 480 months in prison, again ordering LEM and registration under SORA. He appealed, arguing that lifetime SORA registration constituted cruel or unusual punishment and that LEM constituted cruel or unusual punishment and an unconstitutional search. The Court of Appeals, GLEICHER, C.J., and MARKEY and PATEL, JJ., affirmed in an unpublished per curiam opinion issued September 22, 2022 (Docket No. 358780). Defendant applied for leave to appeal in the Supreme Court, which ordered oral argument on the application. 513 Mich 1118 (2024).

In an opinion by Justice THOMAS, joined by Chief Justice CAVANAGH and Justices WELCH, BOLDEN, and HOOD, the Supreme Court, in lieu of granting leave to appeal, *held*:

The 2021 SORA, MCL 28.721 *et seq*., as amended by 2020 PA 295, constitutes punishment, but is not cruel or unusual under Const 1963, art 1, § 16. The portion of the Court of Appeals' judgment rejecting defendant's SORA challenge and holding that the 2021 SORA is not cruel or unusual punishment was affirmed, but the judgment was vacated to the extent that it was inconsistent with the reasoning of the Supreme Court.

1. Defendant presented both facial and as-applied challenges to the 2021 SORA as violative of the state constitutional prohibition against cruel or unusual punishment and the federal constitutional prohibition against cruel and unusual punishment. Because the Michigan Constitution offers more protection to defendants, and there was not a facial or as-applied violation

of the Michigan Constitution, the Court did not conduct an independent analysis under the federal Constitution. To determine whether a statute constitutes punishment, the Court first considers whether the Legislature intended the penalty to be a criminal punishment or a civil regulation. As the Court held in *People v Lymon*, ___ Mich ___ (July 29, 2024) (Docket No. 164685), the Legislature intended the 2021 SORA as a civil regulation. The Court next considers whether the statute is punishment despite a nonpunitive legislative intent. The nonexhaustive factors that are relevant to the inquiry include whether the statute (1) has been historically regarded as punishment, (2) imposes an affirmative disability or restraint, (3) promotes the traditional aims of punishment, (4) has a rational connection to a nonpunitive purpose, and (5) is excessive with respect to its nonpunitive purpose. Although these factors were considered previously as applied to the 2011 SORA in *People v Betts*, 507 Mich 527 (2021), and with respect to the 2021 SORA as applied to those who had committed nonsexual offenses in *Lymon*, neither decision was dispositive here. As to the first factor, the 2021 SORA does not resemble the traditional punishment of banishment, but it does resemble parole and shaming, and therefore, this factor weighed in favor of a determination that the 2021 SORA is punishment. The second factor also favored the determination that the 2021 SORA is punishment because of the many significant requirements it imposes on registrants, including the disclosure of personal information and other reporting requirements. As the Court concluded in *Betts* and *Lymon*, the third factor continued to support the conclusion that the 2021 SORA is punishment because the registration requirements were still linked solely to the crime of conviction rather than to an individualized risk assessment, which aligned with the traditional penological goal of retribution. The fourth factor aligned with a determination that the 2021 SORA is a civil remedy because it has a rational connection to a nonpunitive purpose, i.e., assisting law enforcement officers and the people of Michigan in preventing and protecting against the commission of future sexual offenses by convicted sex offenders. Finally, the fifth factor weighed in favor of a finding of punishment because multiple aspects of the 2021 SORA are excessive relative to its stated public-safety purpose. The 2021 SORA divides offenders into tiers based on the offense of conviction and prior history of registrable offenses. Offenders in the most restrictive tier, Tier III, are subject to lifetime registration requirements, must report in person four times a year, and cannot petition for removal on the basis of age, infirmity, low risk of recidivism, or sustained offense-free conduct. The tiering system does not sufficiently align with the legislative intent to protect the public and reduce the occurrence of future sex crimes. The combination of lengthy (or sometimes lifetime) reporting requirements with no opportunity to petition for removal is another excessive component of the 2021 SORA. The SORA website is overinclusive and therefore excessive, and it may be detrimental to the goal of public safety. Therefore, defendant met his burden under *Kansas v Hendricks*, 521 US 346, 361 (1997), to show by the clearest proof that the 2021 SORA constitutes punishment.

2. Defendant's facial challenge to the 2021 SORA under Const 1963, art 1, § 16 failed because the statute is not grossly disproportionate in all instances. His as-applied challenge also failed because Tier III registration, as applied to defendant, was not cruel or unusual. To determine whether a statute is grossly disproportionate and therefore violates the prohibition against cruel or unusual punishment, the Court considers (1) the severity of the sentence relative to the gravity of the offense, (2) sentences imposed in the same jurisdiction for other offenses, (3) sentences imposed in other jurisdictions for the same offense, and (4) the goal of rehabilitation. Regarding the first factor, as a Tier III offender, defendant was required to register for life, and if released from prison, he would be subject to quarterly in-person reporting requirements. His offense was

particularly grave and the punishment was relatively moderate. Moreover, defendant did not present evidence of his individual risk of reoffending in support of his as-applied challenge. Accordingly, this factor did not favor a finding of gross disproportionality for either his facial challenge or his as-applied challenge. The second factor, on balance, also did not favor a finding of gross disproportionality with respect to defendant's as-applied challenge. Comparing defendant's punishment as a Tier III offender to punishments imposed for other similarly serious offenses, the penalties imposed for Tier III offenses are generally more severe than those for offenses in other tiers. The tier system was excessive to its nonpunitive goals, but lifetime SORA registration for Tier III offenders was not a disproportionate punishment relative to the offense committed. Similarly, other serious offenses that did not require registration (because they did not include a sexual element) can result in lifetime or lengthy term-of-years sentences. Lifetime registration requirements were not insignificant, but they were not disproportionate relative to lifetime imprisonment. When compared to other states' registration schemes, the record did not show that there is a clear national trend shifting away from a more punitive sex-offender-registration scheme for similarly situated offenders or that certain components of the 2021 SORA are uniquely punitive for convicted sex offenders, so the third factor did not favor a finding of gross disproportionality. Regarding the fourth factor, the 2021 SORA does not address the underlying causes of a defendant's conduct or support a defendant's reintegration as a noncriminal member of society. Moreover, SORA fails to account for individualized levels of risk, and lifetime registration may work against the goal of rehabilitation and other penological goals. Therefore, this factor favored a finding of gross disproportionality. On balance, the 2021 SORA is not cruel or unusual punishment either in all instances or as applied to defendant. Because the 2021 SORA constitutes punishment but is not cruel or unusual in every instance, defendant's facial and as-applied constitutional challenges raised under the state Constitution failed.

Court of Appeals judgment affirmed to the extent it held that the 2021 SORA is not cruel or unusual punishment but vacated to the extent that it is inconsistent with the Supreme Court's opinion. Leave to appeal denied with respect to defendant's challenges related to LEM.

Justice ZAHRA, concurring in part and dissenting in part, agreed that the 2021 SORA is not violative of state or federal constitutional prohibitions against excessive punishment but disagreed that it was a form of punishment. He also disagreed that defendant had met the exceptionally high burden to show by "the clearest proof" that the 2021 SORA is so punitive in either purpose or effect as to negate the state's intention to deem it a civil regulation. Justice ZAHRA would have affirmed the judgment of the Court of Appeals as to defendant's SORA challenge but vacated its opinion to the extent that it held that the 2021 SORA was punishment as applied to offenders whose crimes contain a sexual component. Under the analytical framework used in *Smith v Doe*, 538 US 84 (2003), the 2021 SORA did not resemble traditional parole or shaming in any meaningful way, so this factor did not favor a finding that it was punishment. As to the second factor, the 2021 SORA also did not resemble a traditional physical restraint or impose any restrictions on a registrant's daily life and interactions. In distinguishing this case from *Smith*, the majority opinion cited SORA's in-person reporting requirements and the increased use of the internet since *Smith* was decided, but periodic in-person reporting is a requirement of the federal Sex Offender Registration and Notification Act, 34 USC 20901 *et seq*., and the majority opinion did not explain why rising internet usage after *Smith* rendered *Smith* null. Regarding the third factor, the 2021 SORA did not promote the traditional aims of punishment. There was no merit to

the majority opinion's claim that a public registry amounted to retribution; rather, publishing information on categories of crime was reasonably related to the regulatory objective. The fourth factor supported a finding that the 2021 SORA is a civil remedy because it has a rational connection to the nonpunitive purpose of assisting law enforcement officers in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The 2021 SORA is not excessive to its stated public-safety purpose under the fifth factor because it is a reasonable means of protecting the public from the commission of future criminal acts by *sexual* offenders. The requirements it imposes on offenders were a reasonable means of protecting the public, and the publication of extensive personal information on the SORA website was not overinclusive or detrimental to the goal of public safety, but, rather, was rational as applied to sex offenders. Finally, only Tier III offenders were required to register for life, but they are the most dangerous subset of sex offenders, so this requirement was a reasonable means of protecting the public. Therefore, the 2021 SORA is not punishment, and, as the majority opinion held, it is not cruel or unusual punishment.

Justice BERNSTEIN, concurring in part and dissenting in part, dissented from Part III(B) of the majority opinion because he would have assumed without deciding that the 2021 SORA is punishment, given that any punishment in this case was not cruel or unusual.

# OPINION

Chief Justice:
  Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED December 19, 2025

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                          No. 165008

ROBERT JAMES KARDASZ,

     Defendant-Appellant.

BEFORE THE ENTIRE BENCH

THOMAS, J.

This case concerns the constitutionality of the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. Defendant, Robert Kardasz, contends that the 2021 SORA is a cruel and/or unusual punishment in violation of the state and federal Constitutions. US Const, Am VIII; Const 1963, art 1, § 16. We disagree. While the 2021 SORA[1] is punishment, we do not find that its requirements are cruel or unusual, either under the facial

---

[1] MCL 28.721 *et seq*., as amended by 2020 PA 295, effective March 24, 2021.

challenge brought here or as applied to defendant. Accordingly, we affirm the judgment of the Court of Appeals as to defendant's SORA challenge but vacate its opinion to the extent that it is inconsistent with our reasoning.

Defendant also challenges his sentence to lifetime electronic monitoring (LEM) under MCL 750.520n, arguing that LEM violates his state and federal constitutional rights against unreasonable searches. US Const, Am IV; Const 1963, art 1, § 11. Additionally, defendant claims that LEM is an unconstitutionally cruel and/or unusual punishment. We deny leave to appeal on these challenges related to LEM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant is serving a 25- to 40-year prison sentence. In 2018, he was convicted by a jury of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b), for the sexual assault of his five-year-old daughter. He was originally sentenced to a term of imprisonment that exceeded the 25-year statutory minimum required under MCL 750.520b(2)(b). He appealed, and the Court of Appeals affirmed his conviction but vacated his sentence and remanded to the trial court for resentencing. *People v Kardasz*, unpublished per curiam opinion of the Court of Appeals, issued November 19, 2019 (Docket No. 343545), p 9. On remand, the trial court sentenced him to 25 to 40 years in prison. The judgment of sentence also indicated that, upon his release, defendant would be subject to LEM and would be required to comply with SORA for the remainder of his life. Defendant appealed, challenging, in relevant part, the constitutionality of SORA and his LEM sentence, and the Court of Appeals affirmed.

2

*People v Kardasz*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2022 (Docket No. 358780).

Defendant sought leave to appeal in this Court. His application was held in abeyance while this Court considered another challenge to the 2021 SORA in *People v Lymon*, ___ Mich ___; ___ NW3d ___ (July 29, 2024) (Docket No. 164685). *Lymon* did not dispose of the constitutional challenges presented in defendant's application, as that case held that the 2021 SORA is cruel or unusual punishment as applied to crimes that do not contain a sexual element. *Id.* at ___; slip op at 37-38. The 2021 SORA was not in effect when defendant was convicted, sentenced, and resentenced, but the parties agree that he is currently subject to that act and he did not raise an ex post facto challenge.[2] Accordingly, we directed oral argument as to whether

> (1) requiring the defendant to register as a sex offender under [SORA], MCL 28.721 *et seq.*, as amended by 2020 PA 295, effective March 24, 2021 (the 2021 SORA), for the rest of his life constitutes cruel or unusual punishment under Const 1963, art 1, § 16, or cruel and unusual punishment under US Const, Am VIII; (2) lifetime electronic monitoring, when imposed without an individualized assessment of the defendant's recidivism risk and without providing a mechanism for removing the monitoring requirement, constitutes cruel and unusual punishment under US Const, Am VIII or cruel or unusual punishment under Const 1963, art 1, § 16, see generally *People v Betts*, 507 Mich 527[; 968 NW2d 497] (2021), but see *People v Hallak*, 310 Mich App 555, 577[; 873 NW2d 811 (2015)], rev'd in part on other grounds 499 Mich 879 (2016); (3) lifetime electronic monitoring constitutes cruel and/or unusual punishment as applied in this case; and (4) lifetime electronic monitoring constitutes an unreasonable search in violation of US Const, Am IV or Const 1963, art 1, § 11, see *State v Grady*, 372 NC 509[; 831 SE2d 542] (2019) [(*Grady III*)[3]], and *Park v State*, 305 Ga 348[; 825 SE2d 147]

---

[2] Therefore, the case before us today does not include, and we do not decide, an ex post facto challenge to the 2021 SORA.

[3] *State v Grady*, 372 NC 509, is referred to as "*Grady III*" by the North Carolina courts. "*Grady II*," which is not discussed in this opinion, refers to the opinion of the North

3

(2019), but see *Hallak*, 310 Mich App at 581. [*People v Kardasz*, 513 Mich 1118, 1118-1119 (2024).]

After hearing oral argument, we ordered supplemental briefing, asking the parties to address: "(1) what length of parole the defendant is subject to and whether the defendant is subject to parole for life, see MCL 791.242(3); and (2) what impact, if any, the term of parole has on the constitutionality of the defendant's sentence to lifetime electronic monitoring." *People v Kardasz*, ___ Mich ___, ___; 23 NW3d 534, 534 (2025). We deny leave on the issues related to LEM.

## II. STANDARD OF REVIEW

This Court reviews questions of constitutional law de novo. See *Johnson v VanderKooi*, 509 Mich 524, 534; 983 NW2d 779 (2022). Statutes are presumed to be constitutional, and the party challenging the statute has the burden of showing otherwise. See *People v Burkman*, 513 Mich 300, 326; 15 NW3d 216 (2024).

## III. CRUEL OR UNUSUAL PUNISHMENT CHALLENGE TO SORA

Defendant claims that the imposition of the 2021 SORA violates the Michigan Constitution's prohibition against "cruel or unusual punishment." Const 1963, art 1, § 16. He presents both a facial challenge and an as-applied challenge. He brings a similar claim under the parallel "cruel *and* unusual" provision of the federal Constitution. US Const, Am VIII (emphasis added). Since Const 1963, art 1, § 16 offers broader protection to criminal defendants than US Const, Am VII, and we find that there is neither a facial nor

---

Carolina Court of Appeals after remand from the United States Supreme Court, *State v Grady*, 259 NC App 664; 817 SE2d 18 (2018).

4

an as-applied violation of the Michigan Constitution, we need not conduct an independent analysis under the federal Constitution. See *Lymon*, ___ Mich at ___; slip op at 9 n 7.

In evaluating arguments that Const 1963 art 1, § 16 has been violated, we first assess whether the penalty at issue is a criminal punishment or a civil regulation, see *Lymon*, ___ Mich at ___; slip op at 9-10, and then, if it is a punishment, whether that punishment is cruel or unusual, see *People v Bullock*, 440 Mich 15, 34 n 17; 485 NW2d 866 (1992).

## A. THE ONGOING EVOLUTION OF SORA

We consider this case against the backdrop of the history of sex-offender registries, both in this state and nationwide. In the early 1990s, prior to the enactment of federal sex-offender-registration requirements, 24 states had passed legislation requiring convicted sex offenders to register with their local police department.[4] These laws varied greatly and did not always allow for the sharing of information between states.[5] In 1994, after a series of highly publicized sexual assaults and murders of young children, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act (the Wetterling Act), 42 USC 14071 to 42 USC 14073,[6] which imposed penalties on states that failed to create a sex-offender registry and created a system for police to track

---

[4] Logan & Prescott, eds, *Sex Offender Registration and Community Notification Laws: An Empirical Evaluation* (Cambridge: Cambridge University Press, 2021), ch 1, p 12.

[5] McPherson, *The Sex Offender Registration and Notification Act (SORNA) at 10 Years: History, Implementation, and the Future*, 64 Drake L Rev 741, 746-748 (2016).

[6] Repealed July 27, 2006; currently found at 34 USC 20901 *et seq*. The earliest version of the Wetterling Act was introduced in 1991; a revised version was signed into law in 1994.

offenders.[7] The Wetterling Act required those deemed "sexually violent" to report quarterly for the rest of their lives and other offenders to report annually for 10 years upon release. See former 42 USC 14071(b)(3) and (6). In response, Michigan launched its first iteration of SORA that same year. 1994 PA 295.[8] In line with the Wetterling Act, Michigan's registry data was initially accessible only to local law enforcement. *Betts*, 507 Mich at 533. This version of SORA did not include a statutory requirement that registry information be made available to the public, either through publication or through direct notification of individuals. See *id*. at 533-534.

Michigan's SORA has been amended numerous times. *Id*. at 533-536; *Lymon*, ___ Mich at ___; slip op at 2. The Legislature has altered both the accessibility of the registry and the obligations imposed on registrants by the registry, changing SORA from a confidential law enforcement database into a "publicly accessible registry that restricted registrants' movements and required registrants to regularly report various life details and changes to law enforcement in person." *Lymon*, ___ Mich at ___; slip op at 2.

After the Wetterling Act became law, Congress passed Megan's Law, which imposed penalties for states that failed to include a community-notification component in their registration schemes.[9] Many states' sex-offender-registration laws expanded, in many instances to align with shifting federal guidelines. The United States Supreme Court

---

[7] See former 42 USC 14071(g)(2); Note, *Who are the People in Your Neighborhood? Due Process, Public Protection, and Sex Offender Notification Laws*, 74 NYU L Rev 1451, 1458-1459 (1999).

[8] Michigan's SORA was approved on July 13, 1994, and took effect on October 1, 1995. 1994 PA 295.

[9] Former 42 USC 14071(d)(1) and (2); *Community Notification Laws*, pp 12-13.

6

reviewed the constitutionality of one early registration scheme in *Smith v Doe*, 538 US 84; 123 S Ct 1140; 155 L Ed 2d 164 (2003) (considering an ex post facto challenge to the Alaska Sex Offender Registration Act). The *Smith* Court held that Alaska's sex-offender-registration scheme did not violate the Ex Post Facto Clause because it was a civil regulation rather than a criminal punishment. *Id*. at 105-106.[10] The United States Supreme Court has not examined whether more recent state registration schemes are punishment.[11]

In 2011, Congress introduced a system of offense-based tiers in the Adam Walsh Child Protection and Safety Act, Title I of which is the Sex Offender Registration and Notification Act (SORNA).[12] Michigan's SORA amendments have broadly tracked amendments of SORNA. *Betts*, 507 Mich at 570-571 (determining that the 2011 SORA amendments, 2011 PA 17 and 2011 PA 18, were motivated, at least in part, by an intent to

---

[10] This Court has previously highlighted the significant differences between the Alaska registry examined in *Smith* and Michigan's 2011 and 2021 sex-offender registries. See *Betts*, 507 Mich at 553, 562 (distinguishing the 2011 SORA from the registry examined in *Smith* and concluding that the 2011 SORA is punishment); *Lymon*, ___ Mich at ___; slip op at 14 (stating that, as applied to registrants whose crimes did not include a sexual component, the "2021 SORA continues to resemble the traditional punishments of parole and shaming," which was different from the *Smith* Court's analysis of the Alaska statute). See also *Does #1–5 v Snyder*, 834 F3d 696, 705 (CA 6, 2016) (*Does I*) (distinguishing on a number of dimensions Michigan's 2006 SORA and 2011 SORA, which the court determined were punishment, and Alaska's "first-generation" registration system examined in *Smith*). While the dissent may disagree with our prior caselaw, we recognize these significant differences between Michigan's current statutory scheme and the "first-generation" requirements examined in *Smith*, and we are bound to follow the prior decisions of this Court.

[11] The United States Supreme Court declined to review the decision of the United States Court of Appeals for the Sixth Circuit that the 2011 SORA was punishment. *Snyder v Doe*, 583 US 814; 138 S Ct 55; 199 L Ed 2d 18 (2017) (denying certiorari).

[12] 34 USC 20901 *et seq*.; *Community Notification Laws*, pp 13-14.

7

conform to federal mandates under SORNA, though the Legislature included several additional provisions not required by SORNA).  SORNA currently requires states to link the duration of registration to offense-based tiers: Tier I offenders must register for 15 years, Tier II offenders for 25 years, and Tier III offenders for life.  42 USC 20915(a). Michigan's 2021 SORA mirrors those requirements.  MCL 28.725(11), (12), and (13).  See also MCL 28.722(q) through (t) (providing statutory definitions of Tier I, Tier II, and Tier III offenders under SORA).  In some ways, however, Michigan's SORA is more restrictive than SORNA.[13]

Numerous courts have found retroactive application of sex-offender-registration requirements to be punishment, under the test used in *Smith* that we apply today, as well as unconstitutional ex post facto punishment.[14]  Other courts have found their states' sex-

---

[13] For example, under SORNA, consensual sexual conduct is "not a sex offense" and thus not a registrable offense "if the victim was at least 13 years old and the offender was not more than 4 years older than the victim."  34 USC 20911(5)(C).  Under Michigan's SORA, this conduct is a registrable offense, though offenders may petition for removal in some instances.  MCL 28.728c(14)(a).

[14] See *Doe v State*, 189 P3d 999, 1019 (Alas, 2008) (concluding that the Alaska SORA is punishment that violated the state constitution's ex post facto clause because the act neither meaningfully distinguished between classes of sex offenses on the basis of risk nor gave offenders any opportunity to demonstrate their lack of risk); *Wallace v State*, 905 NE2d 371, 384 (Ind, 2009) (holding that the Indiana SORA is punishment that violated the state constitution's ex post facto clause in large part due to the availability of registry information to the public without restriction and without regard to whether registrants posed any particular future risk and because it did not provide a mechanism to shorten the required registration and notification period); *State v Letalien*, 985 A2d 4, 26; 2009 ME 130 (2009) (holding that the state SORNA amendment increasing registration requirements for certain offenders from 15 years to life and adding quarterly in-person reporting, without the opportunity for relief at the discretion of the sentencing court, is punishment that violated state and federal ex post facto laws); *Reid v Lee*, 597 F Supp 3d 1177, 1196-1200 (MD Tenn, 2022) (comparing retroactive application of Tennessee's SORA to retroactive application of Michigan's 2006 and 2011 SORA amendments and determining that the

8

offender-registration schemes punitive using part of the same test used in *Smith* or alternative state tests.[15]  Additionally, restrictions on sex offenders—either in standalone

Tennessee statute is punishment that violated the federal Ex Post Facto Clause); *State v Hinman*, 412 Mont 434, 445-447; 2023 MT 116; 530 P3d 1271 (2023) (deciding that amendments of the state's SORA were punishment that violated the ex post facto clause of the state constitution because public dissemination exacerbates the stigma of being convicted of a sex offense; collateral consequences—including limitations on federal housing—flowed from the registry; doubt has been cast on the effectiveness of registries in preventing recidivism; and reporting requirements demanded a considerable sacrifice of privacy and created a permanent system of state surveillance); *Doe v State*, 167 NH 382, 411; 111 A3d 1077 (2015) (recognizing that amendments of the state sex-offender-registration statute adding a lifetime-registration-without-review provision were punishment that violated state ex post facto laws as applied to the petitioner); *State v Williams*, 129 Ohio St 3d 344, 346-350; 2011-Ohio-3374; 952 NE2d 1108 (2011) (determining that changes to the state's sex-offender statutes that eliminated the ability to challenge classification and that based classification solely on the crime of conviction rather than future dangerousness of the offender were punishment that violated the state constitutional provision against retroactivity); *Starkey v Oklahoma Dep't of Corrections*, 305 P3d 1004, 1017-1030; 2013 OK 43 (2013) (holding that retroactive application of an amendment of the state's SORA that extended the registration period from 10 to 15 years, based solely on the crime committed and absent any evidence of reoffending, was punishment that violated the state constitution).

[15] See, e.g., *Doe v Nebraska*, 898 F Supp 2d 1086, 1125-1127 (D Neb, 2012) (holding that retroactively criminalizing registrants' use of the Internet under Nebraska's SORA was punishment and violated state and federal ex post facto laws because it was driven by revulsion for sex offenders and went far beyond its purported purpose to impose a long-term period of supervised release); *Doe v Dep't of Pub Safety and Correctional Servs*, 430 Md 535, 559-564, 561 n 17; 62 A3d 123 (2013) (concluding that retroactive application of Maryland's SORA to the petitioner violated the state constitution's ex post facto provision based on a standard "similar" to that used in *Smith*, but in which whether the law "is tantamount to imposing an additional criminal sanction" is dispositive, and determining that the law was punishment because it had the practical effect of placing the defendant on probation for life and the statute's dissemination provisions were tantamount to the historical punishment of shaming).  Cf. *State v Cook*, 83 Ohio St 3d 404, 410-411, 418-420; 1998-Ohio-291; 700 NE2d 570 (1998) (concluding that the Ohio sex-offender-registration statute was not punishment, but applying a state constitutional test that examined whether a law "impairs or takes away vested rights, affects an accrued

statutes or in post-SORNA registration-and-notification regimes—have been challenged on a range of other constitutional grounds.[16]

Over time and through statutory amendments, Michigan's SORA has been the subject of numerous legal challenges in state and federal court. In response to an ex post facto challenge, the United States Court of Appeals for the Sixth Circuit held that the 2006 and 2011 amendments of SORA constituted punishment on the basis of: (1) the severe exclusionary restrictions of "student safety zones," see 2005 PA 121 and 2005 PA 127, which prohibited registrants from living, working, or loitering within 1,000 feet of a school; (2) publication of registrants' tier classifications on the SORA website, which ostensibly correlates with dangerousness, despite a lack of individualized assessment; (3) cumbersome in-person reporting; lengthy and sometimes lifetime requirements; and (4) "scant" evidence that such restrictions served their purpose of keeping communities safe.

---

substantive right, imposes new or additional burdens, duties, obligation, or liabilities as to a past transaction, or creates a new right").

[16] The United States Supreme Court struck down a North Carolina statute separate from that state's SORA that prohibited sex offenders from accessing social-networking websites as a violation of the right to freedom of speech under the First Amendment. *Packingham v North Carolina*, 582 US 98, 108; 137 S Ct 1730; 198 L Ed 2d 273 (2017). In lower courts, registration statutes have been challenged for vagueness and found to violate the Due Process Clause. See, e.g., *Nebraska*, 898 F Supp 2d at 1122-1123 (holding that a statute criminalizing sex offenders' use of websites was unconstitutionally vague). Stricter registration requirements for out-of-state offenses have been struck down as violations of the Equal Protection Clause. See, e.g., *Hendricks v Jones ex rel State ex rel Oklahoma Dep't of Corrections*, 349 P3d 531, 536-537; 2013 OK 71 (2013) (holding that applying Oklahoma's SORA requirements to sex offenders who resided in Oklahoma but were convicted in another jurisdiction before the law was enacted, but not applying these requirements to Oklahomans who had committed a similar offense before the act's enactment, violated equal-protection guarantees, and remanding for further factual determination); *ACLU of New Mexico v Albuquerque*, 139 NM 761, 772-773; 2006-NMCA-078; 137 P3d 1215 (NM App, 2006).

*Does #1–5 v Snyder*, 834 F3d 696, 705 (CA 6, 2016) (*Does I*). For similar reasons, discussed in greater detail below, this Court also held that the 2011 SORA is punishment and vacated a conviction of failure to register that was based on retroactive application of the law. *Betts*, 507 Mich at 574. We later held that the 2021 SORA was punishment as applied to nonsexual offenders, and we narrowly invalidated the 2021 SORA on constitutional proportionality grounds as applied to defendants whose crimes lacked a sexual component, in *Lymon*, ___ Mich at ___; slip op at 17-18, 37-38.

In response to motions for summary judgment in *Does v Whitmer*, 751 F Supp 3d 761, 784-785 (ED Mich, 2024) (*Does III*), a federal district court invalidated additional aspects of the 2021 SORA on various grounds. First, the court held that retroactive application of the statute was punishment[17] in violation of the Ex Post Facto Clause of the federal Constitution. *Id*. at 784-795. Second, the court held that procedural due process entitled defendants whose offenses were sexual in nature, but who were convicted of crimes that did not contain a sexual element, to a judicial hearing to determine if the crime was a registrable offense. *Id*. at 816-818. Third, the court determined that the process for registering people with non-Michigan offenses violated their right to due process because they were not given notice or a hearing before being placed on the registry, and subjecting these registrants to harsher treatment than people with Michigan convictions was an equal-protection violation. *Id*. at 818-821. Finally, the court concluded that the statute violated

---

[17] The United States District Court for the Eastern District of Michigan has analyzed the *Mendoza-Martinez* factors and concluded that the 2021 SORA is punishment. *Does III*, 751 F Supp 3d at 787-795. While we find the logic of *Does III* to be persuasive, we conduct an independent analysis here because that litigation is ongoing and because we are not bound by that court's decision. See *Betts*, 507 Mich at 541.

11

the First Amendment, both by compelling speech through forced admissions of understanding and by chilling speech by requiring reporting of all internet identifiers, including social-media usernames. *Id*. at 821-835; see MCL 28.722(g) (defining "internet identifier" as "all designations used for self-identification or routing in internet communications or posting").

In a subsequent opinion and order granting in part and denying in part the plaintiffs' motion for entry of judgment, the same court held that some terms in the 2021 SORA are unconstitutionally vague, in violation of the Due Process Clause. *Does v Whitmer*, 773 F Supp 3d 380, 394-400 (ED Mich, 2025) (*Does IV*). The court enjoined enforcement of provisions that required the reporting of all telephone numbers used by registrants, any change in telephone numbers used by registrants, any change in information for vehicles used by registrants, and registrants' plans to travel or attend school. *Id*. at 395-399. The court held that these requirements failed under the void-for-vagueness doctrine because it was not reasonable to say that an ordinary person would be able to understand the statutory language. *Id*. The *Does v Whitmer* litigation is ongoing: in June of this year, the United States Court of Appeals for the Sixth Circuit issued a stay of the lower court's judgment during the pendency of the defendants' appeal. *Doe v Whitmer*, unpublished order of the United States Court of Appeals for the Sixth Circuit, issued June 20, 2025 (Case Nos. 25-1413 and 25-1414).

The 2021 SORA still divides offenders into tiers based on the offense of conviction and any prior history of conviction of registrable offenses, which moves an offender into a more restrictive tier. MCL 28.722(r) through (v). Pursuant to MCL 28.728(3)(e), these tiers are no longer published on the SORA website, but they dictate a registrant's reporting

12

requirements, the duration of registration, and the ability to petition for removal from the registry. MCL 28.725(11) through (13). Tier I is the least restrictive tier. These registrants are subject to annual in-person reporting for 15 years and can petition for removal after 10 years. MCL 28.725a(3)(a); MCL 28.725(11); MCL 28.728c(12). Tier II offenders are subject to twice-annual, in-person reporting for 25 years. MCL 28.725a(3)(b); MCL 28.725(12). Tier III offenders are subject to lifetime registration requirements and must report in person four times per year. MCL 28.725(13); MCL 28.725a(3)(c). They cannot petition for removal based on age, infirmity, low risk of recidivism, or sustained offense-free conduct. They may petition for removal if they were adjudicated as juveniles, have not committed any felony (sexual or otherwise) or another registrable sex offense for 25 years, and have successfully completed all conditions of supervised release. MCL 29.728c(13). Registrants in any tier may also petition for removal under a so-called "Romeo and Juliet" provision, which provides for removal if the sexual act was consensual and other conditions concerning the ages of the victim and the defendant are met. MCL 28.728c(14).

In addition to periodic in-person reporting requirements, all registrants must report any changes to their registry information. Changes in residency, employment, educational enrollment, and name must be reported in person within three business days. MCL 28.725(1), (3), (7) and (8). Changes in vehicle information, email address, internet identifiers,[18] phone numbers, and travel plans of seven days or longer must also be reported

---

[18] As noted above, the *Does III* court determined that this provision violated the First Amendment and struck the provision from its final judgment. As of the date of this opinion, the Sixth Circuit has entered a stay of the lower court's judgment pending appeal.

within three days, although the 2021 SORA provided that those reports can be made either in person or by mail. MCL 28.725(2).

The exclusionary "student-safety zones" that were the focus of the punishment analysis in *Betts* were removed from SORA by the 2021 amendments. Registrants no longer face geographic constraints under the law on where they can live, work, or "loiter."[19]

## B. WHETHER THE 2021 SORA CONSTITUTES PUNISHMENT

We now address for the first time whether the 2021 SORA constitutes punishment for all registrants.[20] See *Lymon*, ___ Mich at ___; slip op at 9-10 (stating that "we will first assess whether the penalty at issue is a criminal punishment . . . and then, if it is a punishment, whether that punishment is cruel or unusual"). To determine whether a statute constitutes punishment, this Court engages in a two-part inquiry.[21] *People v Earl*, 495

---

[19] These changes were made after our decision in *Betts*, which held that the retroactive application of SORA as amended by 2011 PA 17 and 2011 PA 18 violated constitutional ex post facto protections. *Betts*, 507 Mich at 533. The *Betts* Court looked specifically at the provisions involving student-safety zones that prohibited registrants from residing, living, loitering, or working within 1,000 feet of a school; immediate reporting requirements that forced registrants to make frequent in-person reports to law enforcement upon even minor life changes; the duration of the reporting requirement being based on an offender's conviction rather than an individualized assessment of the risk that particular offender posed to the community; and the publication of an offender's tier status on the public website. See, e.g., *id*. at 561-562.

[20] In *Betts*, we examined the 2011 SORA and determined that it was punishment. *Betts*, 507 Mich at 563 n 23, 573-574. In *Lymon*, we limited our conclusion that the 2021 SORA is punishment and violates the constitutional ban on cruel or unusual punishment to those cases in which it is "applied to non-sexual offenders." *Lymon*, ___ Mich at ___; slip op at 30.

[21] We have used this analysis in addressing ex post facto claims as well as "cruel or unusual punishment" claims where the alleged punishment is not a criminal sentence. See, e.g., *Betts*, 507 Mich at 542-543; *Lymon*, ___ Mich at ___; slip op at 10. Amicus American Civil Liberties Union of Michigan argues that we should reserve the question of whether

14

Mich 33, 38; 845 NW2d 721 (2014). First, we look at legislative intent. If the statute imposes a disability for purposes of punishment, i.e., to reprimand a wrongdoer, we must find that the Legislature intended it to serve as a criminal punishment, and we consider it punishment for purposes of this constitutional analysis. *Id*. at 38-39. If the Legislature intended the restraint as a civil remedy, then we must determine if the statutory scheme is so punitive either in purpose or effect that it negates the Legislature's nonpunitive intent, which would warrant a finding that the statute is punishment. *Id*. at 38.

### 1. LEGISLATIVE PURPOSE

We adopt our reasoning from *Lymon*, ___ Mich at ___; slip op at 12-13, to conclude that the Legislature intended the 2021 SORA as a civil regulation. When the Legislature enacted the 2021 SORA, it retained from the previous version a statement of intent to "better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." MCL 28.721a. SORA was further intended to "provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor" convicted sex offenders. *Id*.

The promotion of public safety described in the statute is a nonpunitive goal, but promoting public safety by deterring future crimes suggests a punitive intent. *Lymon*, ___

---

this is the appropriate test under our state Constitution. The parties have not argued that another analysis is more appropriate. Whether a different test for punishment is appropriate in the cruel-or-unusual-punishment context has yet to be decided by this Court. *Lymon*, ___ Mich at ___; slip op at 9 n 8. As we did in *Lymon*, we conclude that even if a less stringent test for punishment were adopted by this Court, the result of our analysis here would not change because defendant has satisfied the punishment inquiry outlined in *People v Earl*, 495 Mich 33, 38; 845 NW2d 721 (2014).

15

Mich at \_\_\_; slip op at 12. A punitive purpose can also be implied because SORA is imposed as a consequence of criminal conviction, overseen by law enforcement, and punishable by criminal conviction when violated. *Id*. But the Legislature has removed some punitive provisions of SORA since its initial passage, which "supports a theory that the Legislature's recent amendments were made to support a characterization of SORA as civil." *Id*. at \_\_\_; slip op at 12-13. Therefore, we continue to find that the Legislature intended the 2021 SORA as a civil regulation.

## 2. PUNITIVE EFFECTS

We turn now to the question of whether the 2021 SORA is punishment despite a nonpunitive legislative intent. To do so, we consider "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Earl*, 495 Mich at 38 (citation modified). The following nonexhaustive factors are relevant to the inquiry: (1) whether the statute has been regarded historically as punishment; (2) whether the statute imposes an affirmative disability or restraint; (3) whether the statute promotes the traditional aims of punishment; (4) whether the statute has a rational connection to a nonpunitive purpose; and (5) whether the statute is excessive with respect to its nonpunitive purpose. *Betts*, 507 Mich at 545, 549-562; *Smith*, 538 US at 97, citing *Kennedy v Mendoza-Martinez*, 372 US 144, 168-169; 83 S Ct 554; 9 L Ed 2d 644 (1963).[22]

---

[22] The *Mendoza-Martinez* Court considered two additional factors: whether a sanction comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime. *Mendoza-Martinez*, 372 US at 168. These factors were not analyzed in *Betts*, *Lymon*, or *Smith*.

16

We have previously analyzed these factors with regard to the 2011 SORA in *Betts* and the 2021 SORA for nonsexual offenses in *Lymon*. Neither case is dispositive here. In *Betts*, our finding that retroactive application of the 2011 SORA was punishment was based in part on the imposition of "student-safety zones." *Betts*, 507 Mich at 550. This exclusionary provision was not retained in the 2021 SORA. In *Lymon*, we examined the same SORA provision; therefore, much of the analysis under these factors is the same. However, our punishment analysis in *Lymon* also depended in part on the fact that the defendant's crime was not sexual in nature. *Lymon*, ___ Mich at ___; slip op at 17, 26-28. Here, we assess punishment as it relates to crimes that are accurately categorized as sex offenses.

The United States Supreme Court's decision in *Smith*, which determined that Alaska's pre-SORNA scheme for sex-offender registration was a civil remedy and therefore not punishment, *Smith*, 538 US at 96, does not govern the application of these factors to Michigan's more restrictive scheme. As discussed below, we do not find the analysis from *Smith* to be instructive here in light of the statutory distinctions between Alaska's early SORA and Michigan's 2021 SORA; the proliferation of internet usage since *Smith* was decided, which adds more weight to the shaming and restraints aspects of the punishment analysis; and the *Smith* Court's reliance on sex-offender-recidivism data, which has since been called into question.

### a. HISTORY AND TRADITION

We first compare the aspects of the regulation to traditional forms of punishment. See *Betts*, 507 Mich at 550; *Earl*, 495 Mich at 45. We previously held that this factor

favored a finding of punishment due to the similarities between the 2011 SORA and banishment, shaming, and parole. *Betts*, 507 Mich at 550-553. Since the exclusionary rules restricting where registrants can live, work, and loiter were removed from SORA by the 2021 amendments, we decided in *Lymon* that the statute no longer resembles banishment. *Lymon*, ___ Mich at ___; slip op at 14. We still concluded that this factor favored a finding of punishment due to the resemblance to parole and because the shaming element remained in the 2021 SORA, particularly when, as in *Lymon*, the defendant was labeled a sex offender although the crimes he committed lacked a sexual element. *Id.* at ___; slip op at 16-17.

Here, we follow our reasoning from *Lymon* that the 2021 SORA resembles parole because there is no distinction between the parole-like aspects of the statute as applied to defendants whose crimes contain a sexual element and those whose crimes do not. In this case, we are presented with the same annual registration fee and in-person reporting requirements that "may result in registrants being required to contact law enforcement as much as—or more regularly than—the average parolee." *Id.* at ___; slip op at 15; see MCL 28.725 to MCL 28.725c. The ability of law enforcement officers to investigate a registrant's status on the basis of an anonymous tip remains the same, as does the cudgel of potential imprisonment for lack of compliance with any aspect of the regulations. *Lymon*, ___ Mich at ___; slip op at 15; MCL 28.729(1).

As to shaming, we refer back to our opinion in *Betts* to compare the besmirching aspects of the 2011 SORA and the 2021 SORA. In *Betts*, 507 Mich at 551, we considered the breadth of information that was made available to the public, the ease of access to that information, and the tracking features of the website to determine that registration

18

"increased the likelihood of social ostracism," which stood in "sharp contrast" to a scheme that required visiting an official archive to obtain registry information.[23]   The factual distinction between the 2011 and 2021 versions of SORA, as it relates to this shaming analysis, is the removal of registrants' tier classifications from the public SORA website. See 2020 PA 295; MCL 28.728(3)(e).   But we stated in *Lymon* that the personal information of registrants that is publicly available is still substantial. *Lymon*, ___ Mich at ___; slip op at 16.

Defendant is a Tier III offender.[24]  His profile is currently on the SORA website and includes his name, current photo, date of birth, sex, race, hair color, eye color, height, weight, dates of conviction, crimes of conviction, the location of his tattoos, and his registration status.[25]  If he had any aliases, markings, or scars those would also be listed. In addition to this information, the website also lists the offender's vehicles, including the make, model, year, color, and license plate number.  If not incarcerated, the SORA website lists the individual's home, school, and work addresses.  Any member of the public can click a button labeled "Map Offender" to generate a map of an offender's addresses.

---

[23] In *Betts*, we distinguished the United States Supreme Court's opinion in *Smith*, which concluded that Alaska's publicly accessible registry was " 'more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality.' "  *Betts*, 507 Mich at 545, quoting *Smith*, 538 US at 99.

[24] Because defendant is currently incarcerated, he is not subject to in-person reporting requirements.  MCL 28.725a(3).  If he is released from prison, he will be required to report in person four times annually and report any changes to his registry information.  MCL 28.725a(3)(c).

[25] MCL 28.728(2) mandates that this descriptive registry data on an offender, as well as the offender's address and vehicle information, be listed on a public website.

Anyone can click a button labeled "Track Offender" to get email updates when someone's registration information changes.[26]

More generally, registry data is easily accessible and searchable. Any member of the public can search by zip code, city, or county to generate a map of registrants who have a residential or work address in that region.[27] Anyone can generate a list of all published offenders, which produces tens of thousands of results, or a list of all "non-compliant" offenders, who are given this general label for a broad range of conduct, including technical violations, such as the failure to maintain current identification or to pay the annual registration fee.[28] Registry data is also considerably more detailed than publicly available court records, and the availability of bulk data holds all registrants out en masse on the internet—the contemporary town square—for others to shame or shun. See *Doe v State*, 167 NH 382, 406; 111 A3d 1077 (2015).

Accordingly, we conclude that while the 2021 SORA does not resemble the traditional punishment of banishment, it continues to resemble parole and shaming. Thus, this factor weighs in favor of determining that the 2021 SORA constitutes punishment.

---

[26] The SORA website's mapping tool and anonymous tip feature are not prescribed by statute but are currently active features. Michigan State Police, *Michigan Sex Offender Registry* <https://mspsor.com/> (accessed November 20, 2025). The tracking tool is required under MCL 28.730(3).

[27] The search functionality of the SORA website is dictated by MCL 28.728(7).

[28] MCL 28.728(2)(k) requires publication of "registration status." This term is not defined by the statute.

### b. AFFIRMATIVE DISABILITY OR RESTRAINT

For this factor, we "inquire how the effects of the [statute] are felt by those subject to it." *Smith*, 538 US at 99-100. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id*. at 100. As in *Lymon*, here we conclude that the effects of the 2021 SORA are neither minor nor indirect. Our analysis in *Lymon* was untethered to the defendant's status as a nonsexual offender, and we adopt our reasoning from *Lymon* in whole:

> Overall, the 2021 SORA continues to impose significant obligations on registrants by requiring the immediate disclosure of extensive personal information, annual (or more-frequent) in-person visits to law enforcement, and the payment of fees. The 2021 SORA ensures compliance with these requirements through the potential for imprisonment, which is the paradigmatic affirmative restraint. See *Smith*, 538 US at 100. Accordingly, this factor weighs toward a finding that the 2021 SORA constitutes punishment[.] [*Lymon*, ___ Mich at ___; slip op at 20.]

As we noted in *Lymon*, registrants are required to disclose a bevy of personal information, from their home and work addresses to descriptions of their tattoos and their educational enrollment. MCL 28.728(1). Much of this personal information is posted on the public SORA website. MCL 28.728(2). The least restrictive tier requires annual in-person reporting while the most restrictive tier requires quarterly in-person reporting. MCL 28.725a(3). Numerous changes to registry information, including housing or employment updates, must also be reported in-person within three days. MCL 28.725(1), (3), (7) and (8). Other changes can be reported either by mail or in-person, including any updates to internet identifiers. MCL 28.725(2). Registrants are subject to reimprisonment for even technical violations of these regulations. MCL 28.729.

This Court's analysis of this factor diverges from the United States Supreme Court's assessment of the 1994 Alaska SORA because of significant factual differences. Notably, the Alaska SORA did not require any in-person reporting. *Smith*, 538 US at 101. Additionally, we have also seen the "rising and pervasive influence of the Internet since the *Smith* decision." *Lymon*, ___ Mich at ___; slip op at 17. This affects both the reporting requirements for registrants and the response that registrants face from the public. Since registrants are required to disclose all of their internet identifiers, the ubiquity of the internet in daily life necessarily increases reporting duties. Changes in internet identifiers may well be "triggered dozens of times within a year." *Betts*, 507 Mich at 555. The ease of use of the public website, coupled with the ascendence of the internet as a public forum, also distinguishes this case from *Smith*, in which the Court noted only a single instance of "community hostility" connected to Alaska's SORA over a seven-year period. *Smith*, 538 US at 100. But post-*Smith* research has catalogued more frequent vigilantism against registrants, including stalking, threats, harassment, and violence.[29] Though it may have been true more than 20 years ago, it is no longer accurate to say that such acts of public antagonism do not "flow . . . from" the registry itself. *Smith*, 538 US at 101. When assessing registrants' obligations under the law, it is appropriate to consider both state-

---

[29] See, e.g., Lageson & Maruna, *Digital Degradation: Stigma Management in the Internet Age*, 20 Punishment & Soc'y 113, 113, 116-127 (2018); Tewksbury, *Collateral Consequences of Sex Offender Registration*, 21 J Contemp Crim Just 67, 76 (2005); Williams, *The Sex Offender Housing Dilemma: Community Activism, Safety, and Social Justice* (New York: New York University Press, 2018), pp 1, 3; Purshouse, *"Paedophile Hunters," Criminal Procedure, and Fundamental Human Rights*, 47 J L & Soc'y 384, 384-385, 388-396, 404-407 (2020); Lageson, *Digital Punishment: Privacy, Stigma, and the Harms of Data-Driven Criminal Justice* (New York: Oxford University Press, 2020), pp 91-112.

based and publicly induced collateral consequences that result from the legislation.  See

*Betts*, 507 Mich at 544-555; *Lymon*, ___ Mich at ___; slip op at 20.

In alignment with our precedent, we continue to find that because the 2021 SORA imposes affirmative disabilities and restraints, this factor favors punishment.[30]

### c. TRADITIONAL AIMS OF PUNISHMENT

Under this factor, we consider whether the 2021 SORA promotes the traditional aims of punishment: retribution, specific deterrence, and general deterrence.  See *Earl*, 495 Mich at 46.  As we did in *Lymon*, we look to our reasoning from *Betts*, because the distinctions between the 2011 and 2021 versions of SORA do not materially affect our analysis of this factor:

> "Deterrence is necessarily encompassed by SORA's stated purpose of 'preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders.'  MCL 28.721a.  The extensive requirements of the 2011 SORA also generally deterred potential offenders by increasing the resultant consequences of sexual predation.  Yet the aim of deterrence

---

[30] The dissent points to federal caselaw that it asserts supports a contrary conclusion.  For instance, the court in *Hope v Comm'r of Indiana Dep't of Correction*, 9 F4th 513, 532-533 (CA 7, 2021) (en banc), concluded that a provision in the Indiana SORA imposed affirmative disabilities and restraints but that this was not enough, on its own, to make the provision punitive.  In *Cutshall v Sundquist*, 193 F3d 466, 474-475 (CA 6, 1999), the public-disclosure component of the 1994 Tennessee SORA at issue in that case was markedly different from the one at issue here.  Rather than publishing information on nearly all offenders on a public website, law enforcement officers were only permitted to disclose registry information when "disclosure [was] necessary to protect the public."  *Id*. at 474.  This was a key consideration in that court's determination that the Tennessee SORA did not impose affirmative disabilities or restraints.  *Id*. at 474-475.  While other federal courts have concluded that sex-offender registries do not impose affirmative disabilities or restraints, as in *American Civil Liberties Union of Nevada v Masto*, 670 F3d 1046, 1056-1057 (CA 9, 2012), we also note that our previous decision in *Lymon* that the 2021 SORA does impose affirmative disabilities and restraints is binding precedent that this Court must follow.

23

alone does not render a statute punitive. See *Smith*, 538 US at 102. As the United States Supreme Court has reasoned, 'To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.' *Id.* (quotation marks and citation omitted). However, the deterrent effect of the 2011 SORA is not merely an indirect consequence, incidental to its regulatory function, but instead a main feature of the statutory scheme. See MCL 28.721a.

The 2011 SORA also supports the aim of retribution. The 2011 SORA was imposed on offenders for the sole fact of their prior offenses and made no individualized determination of the dangerousness of each registrant, indicating that SORA's restrictions were retribution for past offenses rather than regulations to prevent future offenses. See *Smith*, 538 US at 109 (Souter, J., concurring in the judgment) ('The fact that the Act uses past crimes as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.').'' [*Lymon*, ___ Mich at ___; slip op at 21-22, quoting *Betts*, 507 Mich at 556-558.]

Our analysis of this factor in *Lymon* was not dependent on the nonsexual nature of the offenses committed in that case. Accordingly, we continue to find that the 2021 SORA amendments did not alter the intent of the Legislature to deter future criminal sexual acts. *Lymon*, ___ Mich at ___; slip op at 22; see MCL 28.721a. The registration requirements are still linked solely to the crime of conviction rather than to an individualized risk assessment, which aligns with the traditional penological goal of retribution. *Lymon*, ___ Mich at ___; slip op at 22. Thus, this factor continues to support a finding that the 2021 SORA is punishment.

d. CONNECTION TO NONPUNITIVE PURPOSE

Next, this Court considers whether the 2021 SORA has a rational connection to a nonpunitive purpose. *Earl*, 495 Mich at 46. Rationality is a "low bar." *Betts*, 507 Mich

24

at 558. "A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 US at 103. Even with respect to those provisions of the legislation that required registration for nonsexual offenses, we still found a rational connection to SORA's stated purpose of protecting the public. *Lymon*, ___ Mich at ____; slip op at 23-24. Here, in addressing crimes that are sexual in nature, we conclude that the statute is rationally connected to the goals of "assist[ing] law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." MCL 28.721a. We need not consider "whether [a statute] is the most narrowly tailored decision or the most effective method to achieve the nonpunitive goal." *Lymon*, ___ Mich at ___; slip op at 23. Accordingly, this factor aligns with a determination that the 2021 SORA is a civil remedy.

### e. EXCESSIVENESS

The final factor in assessing whether a regulatory scheme is punitive considers the extent to which the "means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 US at 105. Our analysis of this factor necessarily diverges from *Betts* and *Lymon*. As noted, in *Betts*, our determination that the 2011 SORA was excessive relied, in part, on the exclusionary "student-safety zones" that restricted where registrants could live, work, and loiter. *Betts*, 507 Mich at 550-551, 554-555, 561-562. These location restrictions were removed from SORA by the 2021 amendments. *Lymon*, ___ Mich at ___; slip op at 12-14. In *Lymon*, our finding that the 2021 SORA was excessive as applied to nonsexual offenders centered on the fact that "[s]uch offenders are branded dangerous sex offenders even though their crimes contained no sexual component and even though there

25

has been no determination that they pose such a risk of harm to the community." *Id*. at ___; slip op at 26. In this case, we consider the application of the 2021 SORA to offenders whose crimes were sexual in nature.

While the facts in *Betts* and *Lymon* are distinct, in both cases our analysis of excessiveness focused on the efficacy of SORA. Understanding the "robust scientific debate" on the utility of sex-offender registration and notification schemes in reducing recidivism is relevant to the excessiveness inquiry because it sheds light on whether the statute is serving the legislative intent of protecting the public against the commission of future criminal sexual acts. *Id*. at ___ n 18; slip op at 26 n 18. Sex-offender registries were initially premised on several assumptions, such as that all sex offenders are dangerous and highly likely to recidivate, that risk of recidivism could be linked solely to the offense of conviction, that risk of recidivism was static throughout an offender's life, and that registration provisions would be an effective means to reduce these high, lifetime risks.[31] Based on the evidence we reviewed in deciding *Betts*, we concluded that that the efficacy of SORA as it existed at that time was "unclear." *Betts*, 507 Mich at 561. After reviewing additional studies in *Lymon*, we continued to express "uncertainty" about "SORA's general efficacy." *Lymon*, ___ Mich at ___; slip op at 25. Here, we attempt to provide more clarity on which aspects of the 2021 SORA are not supported by research. We focus on the tiering of registrants, the inclusion of registrants with a low risk of reoffending on the public website, and the lack of opportunity for removal.

---

[31] See *Community Notification Laws*, pp 9-10.

Starting with tier classifications, we note that Michigan's tiers and their corresponding registration requirements, like the federal SORNA, are based solely on the crime of conviction. Defendant and some amici argue that registration requirements should instead be based on scientifically validated individualized risk assessments, such as the Static-99R—a risk-prediction instrument designed to estimate the probability of sexual reconviction for adult males. The Michigan Department of Corrections has used the Static-99R for more than a decade to assess sex-offender-recidivism risk and determine programming and treatment needs for prisoners, probationers, and parolees. Research suggests that individualized risk assessments are far more correlative with rates of recidivism than the offense-based tiers used in SORA.[32] This data is complicated by the fact that recidivism rates generally reduce over time,[33] and the highest-tier offenders are typically incarcerated for longer periods.

The 2021 SORA's conviction-based approach results in a tier system that is seemingly both overly restrictive in some instances and potentially under-restrictive in

---

[32] See generally Hanson & Morton-Bourgon, *The Accuracy of Recidivism Risk Assessments for Sexual Offenders: A Meta-Analysis of 118 Prediction Studies*, 21 Psych Assessment 1 (2009). We also reviewed another report with this information, which was filed by amicus in this case, *Amended Report of German Marquiez Alcala, James J. Prescott and R. Karl Hanson Re: Class Data*, filed in *Does III*, available at <https://perma.cc/273M-J33F> (filed by amicus American Civil Liberties Union of Michigan).

[33] See, e.g., Hanson et al, *High-Risk Sex Offenders May Not Be High Risk Forever*, J Interpersonal Violence, Vol. 29, Issue 15, pp 2794-2795 (October 2014); Hanson et al, *Reductions in Risk Based on Time Offense-Free in the Community: Once a Sexual Offender, Not Always a Sexual Offender*, 24 Psychol Pub Pol'y & L 48, 53, 55-56 (2018); Thornton et al, *Estimating Lifetime and Residual Risk for Individuals Who Remain Sexual Offense Free in the Community: Practical Applications*, Sexual Abuse, Vol. 33, Issue 1, p 3 (February 2021).

others. Simply put, Michigan's tier system and others like it do not predict or match the actuarial risk of recidivism. As one study of four state tiering systems based on the offense of conviction found, these tiers "did a poor job of identifying high-risk offenders."[34] Many offenders classified as high risk based on their offense of conviction "were classified as low or moderately low risk using the Static-99R," which suggests that tiers based on the offense of conviction "overestimate risk in most cases."[35] Tiering based solely on the offense of conviction may also underestimate risk in other cases.[36] The data provided from Michigan shows this lack of correlation between tier and risk.[37] The analysis of Michigan offense tiers found an "inverse correlation" between tier and risk on a validated assessment tool, where "people in Tier I have the highest risk scores, Tier II the next highest, and Tier III the lowest."[38] In assessing excessiveness, we are not required to find that "the legislature has made the best choice possible to address the problem it seeks to remedy." *Smith*, 538 US at 105. But we do examine whether that choice was reasonable. *Id*. Given the lack of record evidence linking risk of recidivism at the time of release from prison with the SORA tiering system, we conclude that basing reporting duration and duties solely

---

[34] Zgoba et al, *The Adam Walsh Act: An Examination of Sex Offender Risk Classification Systems*, 28 Sexual Abuse J Res & Treatment 722 (2015), available to download at <https://journals.sagepub.com/home/sax>.

[35] *Id*.

[36] See Freeman & Sandler, *The Adam Walsh Act: A False Sense of Security or an Effective Public Policy Initiative?*, Crim Just Pol'y Rev Online (2009), p 13, available to download at <https://journals.sagepub.com/toc/cjpa/21/1>.

[37] *Amended Report Re: Class Data*, p 31.

[38] *Id*.

on the registrable offense does not sufficiently align with the legislative intent to protect the public and reduce future sex crimes.

Next, we examine the publication of extensive personal information on the SORA website. We recognize that there is a rational purpose for disseminating this information to the public with greater ease than information about other types of crimes. Sex crimes are underreported, in part due to the trauma that survivors face when reporting them. See *Lymon*, ___ Mich at ___ n 4 (ZAHRA, J., dissenting); slip op at 4 n 4. Access to a public registry of sex offenders may bolster survivors' likelihood of reporting, particularly if they have been victimized by a repeat offender who is already on the registry. An accessible public database may also support members of the public who may not have the means to run background checks when making decisions about whom they interact with and in what capacity. But this does not mean that the SORA website is rational in all instances.

Data presented by defendant and amici suggest that while registration and reporting requirements do have a positive effect on reducing recidivism, the publication of this information dampens its overall effectiveness. We previously reviewed similar data and were left with a sense of uncertainty. See *Betts*, 507 Mich at 560-561 (discussing a 2011 study, also presented in this case, which found that registration schemes with a publication component are correlated with an increase in sex offenses of more than 1.57%). We now have the benefit of additional research based on the registration schemes in Oregon and Minnesota, which use scientifically validated actuarial tools to assess registrants' risk of reoffending and that only publish data on those with the highest risk.[39] These states publish

---

[39] Or Rev Stat 163A.105(1); Or Rev Stat 163A.215(2); Minn Stat 244.052, Subdivisions 2 and 4(b).

information on 6% and 14% of their registrants on their respective registry websites, whereas the information of 90% of Michigan's registrants who are no longer incarcerated is published on the SORA website,[40] in addition to the information on incarcerated registrants.[41] Numerous other peer-reviewed studies support the conclusion that less-inclusive public registries may reduce sexual recidivism, while overinclusive registries may actually increase recidivism rates.[42] Accordingly, we conclude that the SORA website is overinclusive and thus excessive and may be detrimental to the goal of public safety.

Finally, we assess the duration of Michigan's reporting requirements and the lack of opportunity to petition for removal. Some research suggests that decades-long registration requirements may be reasonable for certain offenders. Studies on desistance, which is the point at which sex offenders are no more likely to be convicted of a sex offense than the general population,[43] inform this observation. Specifically, they show that offenders with an above-average risk level do not reach the point of desistance until 20

---

[40] Oregon State Police, *Sex Offender Registry Section*, <https://sexoffenders.osp.oregon.gov/#/faq> (accessed November 20, 2025); Minnesota Department of Public Safety Bureau of Criminal Apprehension, *Predatory Offender Registry Data* <https://dps.mn.gov/divisions/bca/bca-divisions/investigative-services/specialized-investigative-services/predatory-crimes/por> (accessed November 20, 2025) [https://perma.cc/W9ZE-RY77].

[41] Exceptions to publication exist for certain offenders and offenses. For example, offenders who were adjudicated as juveniles and offenders with a single conviction of CSC-IV against an adult are not included on the SORA website. MCL 28.728(4); MCL 28.722(r)(*v*).

[42] See Agan & Prescott, "Offenders and SORN Laws," in *Community Notification Laws*, p 120 (compiling dozens of studies on the efficacy of sex-offender-registration schemes).

[43] *Amended Report Re: Class Data*, ¶ 62, pp 17-18.

years after their release from prison.[44]  Lengthy registration requirements are not excessive in these cases.

On the other end of the spectrum, offenders who are deemed to be at low risk for reoffending based on actuarial assessments are already at the point of desistance when they are released from prison.[45]  Despite evidence indicating that they are no more likely to commit a sex offense than the general public, they remain under SORA registration requirements either for life or until their term of reporting ends.  Thousands of Michigan's registrants have been living in the community for more than 20 years since their release without a new sexual conviction.[46]  Registrants who are Tier III offenders have no opportunity for removal and will remain subject to SORA for life.  Even registrants who pose virtually no risk of reoffending, such as those who require intensive medical care because of age or disability, must continue to comply with SORA for the entire period dictated by their tier.  The combination of lengthy and sometimes lifetime reporting requirements with no opportunity to petition for removal is another excessive component of the 2021 SORA.

The excessiveness of the 2021 SORA as applied to sex offenders is less pronounced than it was in our analysis of its application to nonsexual offenders in *Lymon*, and the ameliorative amendments of the 2021 SORA make our analysis a closer call here than it was in our assessment of the 2011 SORA in *Betts*.  However, because we have found that

---

[44] *Id*.; Declaration of R. Karl Hanson, Rebuttal Report (April 25, 2023), p 17, available at <https://perma.cc/273M-J33F>.

[45] *Id*.

[46] *Amended Report Re: Class Data*, ¶ 10, p 3.

multiple aspects of the 2021 SORA are excessive to its stated public-safety purpose, we find that this factor weighs in favor of the conclusion that the act is punishment.[47]

### f. PUNITIVE EFFECTS AS A WHOLE

When considering the *Mendoza-Martinez* factors cumulatively, defendant has met his burden to show by "the clearest proof"[48] that the 2021 SORA "is so punitive either in purpose or effect as to negate the State's intention to deem it civil[.]" *Kansas v Hendricks*, 521 US 346, 361; 117 S Ct 2072; 138 L Ed 2d 501 (1997) (citation modified). The only factor that points toward this legislation resembling a civil remedy is its connection to a nonpunitive purpose. In all other respects, the 2021 SORA resembles punishment. It approximates the traditional punishments of shaming and parole, burdens registrants with onerous requirements under the threat of imprisonment for noncompliance, and serves the penological goal of retribution. It is excessive in relation to its stated purpose because it imposes various duties based on unscientific groupings rather than individualized risk

---

[47] The dissent claims that this analysis is inconsistent with cases from the federal courts concluding that the federal SORNA is not excessive. But the cases cited by the dissent note that the offenders failed to distinguish the registration requirements they were subject to from those in the 1994 Alaska SORA considered in *Smith*, whereas here, significant differences have been shown between the 1994 Alaska SORA and the 2021 Michigan SORA. See *United States v Leach*, 639 F3d 769, 773 (CA 7, 2011) ("[The defendant] has not identified any aspects of SORNA's registration provisions that distinguish this case from *Smith*."); *United States v Young*, 585 F3d 199, 206 (CA 5, 2009) ("[The defendant] makes no effort to prove that the effect of SORNA is so punitive as to make it not a civil scheme[.]").

[48] While we conclude that the "clearest proof" standard has been met, we note that this Court has yet to determine whether applying a lower standard may be appropriate under the Michigan Constitution as other states have done under their respective constitutions. See, e.g., *Doe*, 189 P3d at 1008 n 62; *Wallace*, 905 NE2d at 378 n 7; see also *Commonwealth v Cory*, 454 Mass 559, 567-568; 911 NE2d 187 (2009). However, we do not reach this question because the parties did not raise the issue.

profiles, includes a publication requirement that may diminish its overall effectiveness in reducing recidivism, and remains operative beyond any plausible point of utility for thousands of registrants. For all of these reasons, we conclude that the 2021 SORA constitutes punishment.

## C. WHETHER THE PUNISHMENT IS CRUEL OR UNUSUAL

Having determined that the 2021 SORA is punishment, we now consider whether it is unconstitutional under Michigan's prohibition against cruel or unusual punishment. We apply the test from *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972), as affirmed in *Bullock*, to assess whether a punishment is "grossly disproportionate." *Bullock*, 440 Mich at 34-35 & n 17. Under this test, we consider: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically "rooted in Michigan's legal traditions." *Id*. at 33-34.

Defendant brings both a facial challenge and an as-applied challenge. To prevail on a facial proportionality challenge, a defendant must show that there are no circumstances in which the punishment would be valid. *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 568; 566 NW2d 208 (1997). An as-applied challenge is less stringent and requires a court to analyze the constitutionality of the statute against the backdrop of the facts developed in the particular case. *Keenan v Dawson*, 275 Mich App 671, 680; 739 NW2d 681 (2007); *Bonner v City of Brighton*, 495 Mich 209, 223

33

& n 27; 848 NW2d 380 (2014) (emphasizing that in a facial challenge, the plaintiffs "do not challenge the [law's] application in a particular instance").

Since defendant was convicted as a Tier III offender, we focus our analysis on Tier III offenders. Tier III offenders committed the most severe registrable offenses and are subject to the most onerous requirements under the 2021 SORA. We hold that the 2021 SORA is not grossly disproportionate in all instances. Therefore, we cannot conclude that the 2021 SORA is cruel or unusual punishment on its face. We are similarly not convinced that Tier III registration, as applied to defendant, is cruel or unusual. Thus, his as-applied challenge also fails.

### 1. HARSHNESS OF THE PENALTY COMPARED TO THE GRAVITY OF THE OFFENSE

Under the first factor, we ask whether "the punishment is in excess of any that would be suitable to fit the crime." *Lorentzen*, 387 Mich at 176. In considering whether the 2021 SORA is punishment despite a nonpunitive legislative intent, we determined that the 2021 SORA is excessive relative to its stated goals. Our analysis of proportionality is distinct in that we now consider whether the punishment is tailored to the defendant's "personal responsibility and moral guilt" rather than to legislative intent. *Bullock*, 440 Mich at 39.

Tier III is inclusive of a wide range of sexual offenses. This tier includes the most elevated sexual assaults as well as offenders who have committed a repeat Tier II offense. MCL 28.722(u). Defendant is a Tier III offender based on his CSC-I conviction for the sexual assault of his five-year-old daughter. There is no question that defendant's crime was a grave offense or that Tier III is inclusive of other abhorrent crimes. Defendant and other Tier III offenders are required to register for life, and if they are released from prison,

34

they are subject to quarterly in-person reporting and must report any changes to their registry information. These reporting requirements are independent of any offender's individual risk of reoffending.

When this Court invalidated mandatory life sentences for 18-year-olds, we expressed concern about imposing "automatically harsh punishment without consideration of mitigating factors . . . ." *People v Parks*, 510 Mich 225, 259-260; 987 NW2d 161 (2022); see also *People v Taylor*, ___ Mich ___; ___ NW3d ___ (April 10, 2025) (Docket No. 166428) (applying similar reasoning to 19- and 20-year-olds). Here, we consider mandatory punishment that similarly fails to account for individual circumstances, but is far less severe than lifetime imprisonment for young offenders. Likewise, when we invalidated a mandatory 20-year minimum sentence for the sale of marijuana, we expressed a preference for individualized sentencing. *Lorentzen*, 387 Mich at 180-181. *Parks* and *Taylor* dealt with the harshest penalty provided under Michigan law. *Lorentzen* addressed a relatively minor offense. The case before us falls between these extremes.

We are faced with particularly grave offenses and a relatively moderate punishment, which we do not find to be excessive. We acknowledge, however, that the excessiveness of SORA's reporting requirements may increase over time, such as for Tier III offenders who have lived offense-free for decades. But a facial challenge requires contemplating any instance in which the punishment is constitutional, rather than identifying instances in which it is not. Moreover, for an as-applied challenge, we would expect individualized evidence in support; defendant was recently incarcerated and has not presented evidence of his individual risk of reoffending. Accordingly, this factor does not favor a finding of gross disproportionality either for defendant's facial challenge or his as-applied challenge.

35

2. PENALTY IMPOSED FOR THE OFFENSE COMPARED TO OTHER OFFENSES

We next conduct an intrajurisdictional comparison of the penalty imposed for Tier III offenses relative to the penalties imposed for other offenses in Michigan. See *Bullock*, 440 Mich at 33. To begin, we must identify the proper comparators. In *Lymon*, we compared the nonsexual offense of false imprisonment of a minor both to other offenses that required SORA registration and to similarly grave offenses that did not require registration. *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 31-34. Both comparators were indicative of disproportionality. *Id*. The defendant in *Lymon* committed a crime that was not sexual, but he suffered the same penalty as Tier I sex offenders, including those who indecently exposed themselves to a child or produced child sexually abusive activities or materials. *Id*. at ___; slip op at 32-33. Conversely, similar offenses, including false imprisonment of an adult (of which the defendant was also convicted), are not registrable offenses. *Id*. at ___; slip op at 33.

Here, choosing comparators is more complicated. We have already discussed, in analyzing whether SORA is punishment, why the failure to account for future risk of recidivism makes the tier system excessive. But regarding this factor of the "cruel or unusual" analysis, we compare the punishment for defendant—a Tier III offender—to other similarly serious offenses, some of which are sexual and some of which are not. Comparisons to other sexual offenses necessarily entails looking within the tier system. Based solely on the severity of the crimes committed—and without considering future risk, which we deemed important in the punishment inquiry—penalties for Tier III offenses are generally more severe than those for offenses in other tiers with shorter and less stringent requirements.

36

Tier III offenses include the gravest sexual crimes, such as assault with intent to commit criminal sexual conduct involving penetration, MCL 750.520g, and fourth-degree criminal sexual conduct, MCL 750.520e, which requires sexual contact when one of several additional circumstances is shown. Tier II offenses include, among other crimes, knowingly allowing a child to engage in sexually abusive activity. MCL 750.145c(2). Tier I offenses include, for example, possession of child sexually abusive material. MCL 750.145c(4). These tiers account for the severity of the offense committed. Again, this tiering system is excessive to its nonpunitive goals, but this comparison indicates that lifetime SORA registration for Tier III offenders is not a disproportionate punishment relative to the offense committed.

Next, we look to other grave offenses which similarly can result in lifetime or long term-of-years prison sentences but that do not require a comparable registration scheme because they do not include a sexual element. These offenses include second-degree murder, MCL 750.317; terrorism, MCL 750.543f; and torture, MCL 750.85. Some SORA registrable offenses can also result in lifetime or lengthy term-of-years prison sentences, including CSC-I. MCL 750.520b(2)(a) and (b). While lifetime registration requirements are not insignificant, they are not disproportionate relative to lifetime imprisonment. This comparator is neutral in our proportionality analysis.

Having reviewed two comparators, one that is clearly not disproportionate and one that is neutral, we conclude, on balance, that this factor does not favor a finding of disproportionality. Tier III offenders have either committed the most serious sex offenses or are Tier II offenders who have been convicted of a subsequent Tier I or Tier II offense. Since defendant was convicted of CSC-I, the most elevated Tier III offense, we necessarily

37

conclude that this factor also does not favor a finding of gross disproportionality with respect to his as-applied challenge.

### 3. PENALTY IMPOSED FOR THE OFFENSE IN MICHIGAN COMPARED TO OTHER STATES

This factor "looks to comparative law for guidelines in determining what penalties are widely regarded as proper for the offense in question." *Lorentzen*, 387 Mich at 179. We engage in this inquiry to assess the decency of a punishment and to determine if it comports with evolving standards that "mark the progress of a maturing society." *Id*. (quotation marks and citation omitted). In instances where Michigan sits among "a large majority of states" imposing the same penalty, "this factor supports a determination that defendant's punishment is not grossly disproportionate." *Lymon*, ___ Mich at ___; slip op at 34-37 & nn 22 & 23 (noting that 42 states and the District of Columbia included kidnapping or false imprisonment as registrable offenses). When "no other state in the nation imposes a penalty even remotely as severe as Michigan's," this factor obviously tilts the scale in the other direction. *Bullock*, 440 Mich at 40.

We have previously addressed situations in which Michigan's practices were neither patently exceptional nor obviously commonplace. In these instances, we ask whether "there is a clear national trend" moving away from the punishment in question. *People v Stovall*, 510 Mich 301, 318; 987 NW2d 85 (2022) (invalidating mandatory parolable life sentences for juveniles convicted of second-degree murder). When Michigan sat among a sizable minority of jurisdictions that legislatively mandated life without parole for 18-year-olds convicted of first-degree murder, we determined that this factor slightly weighed in

38

favor of requiring an individualized sentencing hearing for those offenders. *Parks*, 510 Mich at 263-264.

Here, we are faced with mixed evidence, due to the myriad components of sex-offender-registration schemes and variations among the states. Michigan is among a substantial minority of states that use a mandatory tier system based on the minimum requirements set out in the federal SORNA.[49] Michigan is also among a minority of states that (1) require lifetime registration, (2) do not use a risk assessment, and (3) do not have any mechanism for most lifetime registrants to petition for removal.[50] This gives us pause, but the evidence ultimately suggests that Michigan is among a plurality of states with a similar sex-offender-registration regime. Nothing in the record shows there is a "clear national trend" shifting away from a more punitive sex-offender-registration scheme for similarly situated offenders or that certain components of the 2021 SORA are uniquely

---

[49] Library of Congress, Federal Research Division, Flattery et al, *Sex Offender Risk Assessment: State-Level Policies for Determining Registration and Notification Requirements*, p 1 n 3 (July 2022) (listing Michigan as one of 22 states that are compliant with SORNA's tier system) <https://www.ojp.gov/pdffiles1/smart/306898.pdf> (accessed November 20, 2025) [https://perma.cc/S3ZX-9RLS].

[50] At least 15 states use risk assessments for their registration or notification systems. See *id*. at 2 & n 9; see also Restoration of Rights Project, *50-State Comparison: Relief from Sex Offense Registration Obligations* <https://ccresourcecenter.org/state-restoration-profiles/50-state-comparison-relief-from-sex-offender-registration-obligations> (accessed November 20, 2025) [https://perma.cc/YMF4-PFUP]. In Michigan, the ability to petition for removal is available for a limited number of registrants who are Tier III offenders and who meet certain statutory requirements, including individuals adjudicated as juveniles who have gone 25 years without being convicted of a felony or listed offense and have successfully completed any required supervision and sex-offender treatment program, MCL 28.728c(13); 19-year-olds who engaged in consensual sexual activity with 15-year-olds, MCL 28.728c(14)(a); and offenders who committed crimes that were not registrable at the time of the offense, MCL 28.728c(15)(b).

39

punitive for all individuals convicted of sexual offenses, including the most serious offenses. Therefore, this factor does not favor a finding of gross disproportionality.

## 4. WHETHER THE PENALTY IMPOSED ADVANCES THE GOAL OF REHABILITATION

Under the final factor, we assess the extent to which the punishment advances Michigan's historical interest in promoting rehabilitation. See *Lorentzen*, 387 Mich at 179-180. We consider rehabilitation because it has the power to "reform criminals" and "thus protect society." *Id*. at 180 (quotation marks and citation omitted). We have focused on "the goal of rehabilitation" because of "the equally important belief that only the rarest individual is wholly bereft of the capacity for redemption." *Bullock*, 440 Mich at 39 n 23 (quotation marks and citation omitted). Since *Lorentzen*, we have consistently considered the rehabilitation function of a punishment in assessing whether it is cruel or unusual. See *Parks*, 510 Mich at 264-265; *Stovall*, 510 Mich at 320-321; *Lymon*, ___ Mich at ___; slip op at 37.

The 2021 SORA "does not address the underlying causes of a defendant's conduct or support a defendant's reintegration as a noncriminal member of society." *Lymon*, ___ Mich at ___; slip op at 37. As we also previously noted, lifetime registration may work against the goal of rehabilitation because it prevents registrants from " 'securing employment and otherwise moving forward with [their] life plans.' " *Id*., quoting *People v Dipiazza*, 286 Mich App 137, 156; 778 NW2d 264 (2009). Registration under the 2021 SORA also harms the financial security, housing stability, and mental health of

40

registrants.[51]   Further, registration leads to severe social consequences that may inhibit rehabilitation and law-abiding behavior.

While rehabilitation is the focus of this test, the state also argues that SORA serves other penological goals, such as deterrence and incapacitation.  As previously discussed, the publication of registry information may actually have a dampening effect on the general deterrent value that sex-offender registries can have.  SORA also fails to account for individualized levels of risk, which cuts against an argument for specific deterrence.  And any need for continued incapacitation should be taken into account in the parole process when individualized determinations of public safety are made prior to release.  Given that SORA does not support rehabilitation, this factor favors a finding of gross disproportionality.

### 5. GROSS DISPROPORTIONALITY CONCLUSION

The *Lorentzen* analysis is not a "simple, 'bright-line' test, and the application of that test may, concededly, be analytically difficult . . . ."  *Bullock*, 440 Mich at 40-41.  On balance, the 2021 SORA is not cruel or unusual punishment either in all instances or as applied to defendant.  Tier III offenders have committed serious sex offenses.  Their punishment is unique to sex offenses, but it is in alignment with a plurality of states that

---

[51] See Bailey et al, *Contextualizing the Effects of Sexual Offender Registration and Notification (SORN) Policies on Employment and Economic Status of Persons Convicted of Sexual Offenses*, 3 J Crime & Crim Behav 1 (2023); UCLA School of Law, The Williams Institute, Meyer et al, *LGBTQ People on Sex Offender Registries in the US*, pp 26-29, <https://williamsinstitute.law.ucla.edu/wp-content/uploads/SORS-LGBTQ-May-2022.pdf> (accessed November 20, 2025) [https://perma.cc/7DTP-C5EE]; Harris & Levenson, *Life on "the List" is a Life Lived in Fear: Post-Conviction Traumatic Stress in Men Convicted of Sexual Offenses*, Int'l J Offender Therapy & Comp Criminology, Vol. 65, Issue 6-7, 763 (2021).

utilize sex-offender-registration schemes in accordance with the federal SORNA requirements. Moreover, defendant committed the most elevated registrable offense and has not provided evidence to support a claim that lengthy registration requirements are not appropriate relative to his individualized level of risk of reoffending.

## IV. CONCLUSION

Given our conclusion that the 2021 SORA is punishment but not cruel or unusual in every instance, defendant's facial and as-applied constitutional challenges raised under the state Constitution fail. Because Michigan's Constitution offers broader protections than the federal Constitution when assessing the proportionality of criminal punishment, it follows that defendant's federal claims must also fail. We affirm the Court of Appeals' decision insomuch as it held that the 2021 SORA is not cruel or unusual punishment in violation of the Michigan Constitution but vacate its opinion to the extent that it is inconsistent with our decision. We deny leave with respect to defendant's claims regarding LEM.

Kimberly A. Thomas
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden
Noah P. Hood

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                          No. 165008

ROBERT JAMES KARDASZ,

      Defendant-Appellant.

_____

ZAHRA, J. (*concurring in part and dissenting in part*).

This case concerns the constitutionality of the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. Defendant, Robert Kardasz, contends that the 2021 SORA[1] is a cruel and/or unusual punishment in violation of the United States and Michigan Constitutions. US Const, Am VIII; Const 1963, art 1, § 16. While I agree with the majority opinion's conclusion that the 2021 SORA is not violative of state or federal constitutional prohibitions against excessive punishment, I disagree with its conclusion that the 2021 SORA is a form of punishment.

Today's opinion advances this Court's line of cases that use the Michigan Constitution to chip away at the legal foundation of public registries.[2] While the Court admits that the 2021 SORA is a civil regulation, a majority of the Court concludes that "defendant has met his burden to show by '*the clearest proof*' that the 2021 SORA 'is so

---

[1] MCL 28.721 *et seq*., as amended by 2020 PA 295, effective March 24, 2021.

[2] See *People v Lymon*, ___ Mich ___; ___ NW3d ___ (July 29, 2024) (Docket No. 164685); *People v Betts*, 507 Mich 527; 968 NW2d 497 (2021).

punitive either in purpose or effect as to negate the State's intention to deem it civil[.]' "[3] The Court's conclusion is mere lip service to this exceptionally high burden of proof. The majority opinion reaches this conclusion not by following sound jurisprudential principles of constitutional law, but instead by second-guessing the Michigan legislative and executive branches and relying on studies opining on the effectiveness of public registries. The accuracy and reliability of these studies may not be known for years, if at all. Rather than leaving it to the people's elected representatives to consider and debate these studies and, if necessary, amend the 2021 SORA, the Court invokes the judicial power to conclude that defendant has shown by "the clearest proof" that SORA is not a civil remedy. Contrary to the majority opinion's conclusions, SORA is not punishment. It is distinct from parole, and the registry's sharing of accurate information with the public regarding sex offenders is not at all similar to colonial "shaming" or other traditional forms of punishment. Additionally, the 2021 SORA, like the federal Sex Offender Registration and Notification Act (SORNA),[4] does not come close to traditionally understood physical restraints, nor does it impose any restrictions or prohibitions on daily life and interactions. SORA's nonpunitive purpose is to prevent and protect against future criminal sexual acts committed by known sexual offenders, and its requirements are a " 'reasonable' choice"[5] in addressing its nonpunitive purpose; therefore, it is not excessive. Requiring individuals who have

---

[3] Quoting *Kansas v Hendricks*, 521 US 346, 361; 117 S Ct 2072; 138 L Ed 2d 501 (1997) (emphasis added).

[4] 34 USC 20901 *et seq*.

[5] *Lymon*, ___ Mich at ___; slip op at 24, quoting *Smith v Doe*, 538 US 84, 105; 123 S Ct 1140; 155 L Ed 2d 164 (2003).

2

been convicted of sexual offenses to register under SORA simply is not punishment. In holding otherwise, the majority opinion is at odds with precedent of the Supreme Court of the United States from which Michigan derives its jurisprudence on distinguishing civil measures and criminal punishment and, specifically, the landmark decision in *Smith v Doe*.[6] I would affirm the judgment of the Court of Appeals as to defendant's SORA challenge but vacate its opinion to the extent that it held that the 2021 SORA was punishment as applied to offenders whose crimes contain a sexual component.

## I. FACTUAL BACKGROUND

Defendant was convicted by a jury of first-degree criminal sexual conduct (CSC-I), MCL 750.520b, for the sexual assault of his five-year-old daughter. Defendant has been sentenced to serve 25 to 40 years in prison.[7] Upon his release, defendant's sentence requires him to be subject to LEM and to comply with SORA for the rest of his life.[8] Defendant appealed, raising constitutional challenges to SORA and LEM, among other claims. The Court of Appeals affirmed.[9]

## II. THE 2021 SORA CHALLENGE

Defendant claims that the 2021 SORA violates the Michigan Constitution's ban on punishments that are cruel or unusual. The majority opinion rejects this argument, but in

---

[6] *Smith*, 538 US 84.

[7] A sentence of 25 to 40 years' imprisonment for CSC-I is consistent with the statutory mandatory minimum. MCL 750.520b(2)(b).

[8] MCL 750.520n(1); MCL 28.725(13).

[9] *People v Kardasz*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2022 (Docket No. 358780).

so doing, it concludes that the 2021 SORA is punishment. Unlike the majority opinion, I would hold that the 2021 SORA is not punishment and would therefore not address whether it is cruel or unusual.[10] Nonetheless, I agree with the majority opinion in holding that defendant's constitutional challenge fails: The 2021 SORA is not cruel or unusual.[11]

## A. THE 2021 SORA IS NOT PUNISHMENT

The 2021 SORA has made Michigan's scheme "nearly identical" to the federal SORNA.[12] In 2024, this Court held that the 2021 SORA was punishment to the extent it applied to offenders whose crimes lacked a sexual component. This Court narrowly invalidated the 2021 SORA on proportionality grounds as applied to those defendants.[13] Here, defendant falls outside the constitutional protections recognized in *Lymon* because

---

[10] Because the majority opinion does not conduct an independent analysis under the federal Constitution and instead rests its holding on the Michigan Constitution, I will only discuss the protections provided by the Michigan Constitution. I do note, however, that there is no indication or textual basis in the Michigan Constitution to require application of a different analysis than that applicable to the United States Constitution in determining whether an action is a "punishment." Const 1963, art 1, § 16 ("[C]ruel or unusual punishment shall not be inflicted[.]"); US Const, Am VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). By contrast, Michigan relies primarily upon a federally created standard to consider whether a punishment is "[c]ruel or unusual." See *People v Stovall*, 510 Mich 301, 341 n 24, 343 n 25; 987 NW2d 85 (2022) (ZAHRA, J., dissenting).

[11] We first assess whether the penalty at issue is a criminal punishment or a civil regulation, see *Lymon*, ___ Mich at ___; slip op at 9-10, and then, if it is a punishment, whether that punishment is cruel or unusual, see *People v Bullock*, 440 Mich 15, 34 n 17; 485 NW2d 866 (1992).

[12] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 1.

[13] *Id*. at ___; slip op at 37-38 (opinion of the Court).

4

he was convicted of a sex crime, CSC-I, for violating his five-year-old daughter.[14] Consequently, this Court must now determine whether the 2021 SORA is punishment for all registrants by engaging in a two-step inquiry:

> First, this Court must determine "whether the Legislature intended the statute as a criminal punishment or a civil remedy." If the statute imposes a disability for the purpose of reprimanding the wrongdoer, the Legislature likely intended the statute as a criminal punishment. However, if the statute imposes a disability to further a legitimate governmental purpose, the Legislature likely intended the statute as a civil remedy.
>
> If this Court determines that the Legislature intended the statute as criminal punishment, then this Court must conclude that the statute is indeed punishment. However, if this Court determines that the Legislature intended the statute as a civil remedy, this Court must then consider "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." However, the Legislature's intent will be rejected only when "a party challenging the statute provides the *clearest proof* that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil."[15]

In *Lymon*, this Court concluded that the Legislature intended the 2021 SORA as a civil remedy, a conclusion that is also adopted by the Court in this case.[16] Having so concluded, the Court must determine whether the 2021 SORA is nonetheless punishment despite the nonpunitive intent of the Legislature. To determine whether a sex-offender-registration statute has the purpose or effect of being punitive, the Supreme Court of the

---

[14] Defendant presents both a facial and an as-applied challenge.

[15] *Id*. at ___; slip op at 10 (citations omitted).

[16] *Id*. at ___; slip op at 12-13.

United States and this Court have identified five of the seven factors from *Kennedy v Mendoza-Martinez*[17] as having particular relevance:

> (1) whether the statute has historically been regarded as punishment; (2) whether the statute imposes an affirmative disability or restraint; (3) whether the statute promotes the traditional aims of punishment; (4) whether the statute has a rational connection to a nonpunitive purpose; and (5) whether the statute is excessive with respect to its nonpunitive purpose.[18]

We must apply these factors to "consider 'whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil.' "[19] Such a conclusion is extraordinary, cutting against established deference to the intents and designs of elected legislatures. "[T]he Legislature's intent will be rejected only when 'a party challenging the statute provides the *clearest proof* that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil.' "[20]

This Court previously analyzed these factors with regard to the 2011 SORA[21] in *Betts* and the 2021 SORA in *Lymon*. In *Lymon*, I dissented, concluding that the 2021

---

[17] *Kennedy v Mendoza-Martinez*, 372 US 144, 168-169; 83 S Ct 554; 9 L Ed 2d 644 (1963). The remaining two factors from *Kennedy* were deemed inapplicable in the context of evaluating the constitutionality of sex-offender-registration statutes. See *Smith*, 538 US at 97.

[18] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 11, citing *Smith*, 538 US at 97; *Betts*, 507 Mich at 549-562.

[19] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 13, quoting *People v Earl*, 495 Mich 33, 38; 845 NW2d 721 (2014).

[20] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 10, quoting *Hendricks*, 521 US at 361.

[21] MCL 28.721, as amended by 2011 PA 17, effective April 12, 2011, and 2011 PA 18, effective July 1, 2011.

6

SORA was *not* punishment as applied to defendants who were convicted of crimes that lacked a sexual component, such as the defendant in *Lymon*, who kidnapped and tortured his two minor children. Nonetheless, the Court narrowly held that the 2021 SORA was punishment as applied to those convicted of crimes that lacked a sexual component. Today, the Court eviscerates its narrow holding in *Lymon* and proclaims that all aspects of the 2021 SORA constitute punishment, regardless of whether the person subject to SORA's registration requirements committed a heinous crime of sexual misconduct against an innocent child. I again dissent and would hold that the 2021 SORA, like the federal SORNA, is *not* punishment as applied to defendants who were convicted of crimes that contain a sexual component.

## 1. *SMITH* AND THE LAW ON WHAT CONSTITUTES PUNISHMENT

My dissenting opinion in *Lymon* thoroughly discussed *Smith v Doe*, in which the Supreme Court of the United States held that Alaska's pre-SORNA scheme for sex-offender registration was a civil remedy and thus was not punishment.[22] *Smith* is helpful in determining what the Supreme Court of the United States would hold with respect to Michigan's sex-offender registry, which is "nearly identical" to the federal sex-offender registry.[23] Also, as noted, we derive our jurisprudence on the distinction between civil

---

[22] See *Smith*, 538 US at 96.

[23] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 1. Moreover, because the Michigan sex-offender registry is "nearly identical" to the federal sex-offender registry, today's holding that the 2021 SORA is punishment is almost equivalent to this Court holding that the federal sex-offender registry is punishment disguised as a civil remedy. That is a bold and incorrect holding.

measures and criminal punishment from the Supreme Court of the United States.[24] Therefore, it is of the utmost importance to contemplate the reasoning of the Supreme Court that led to its determination that Alaska's pre-SORNA scheme for sex-offender registration was not punishment.

I discussed *Smith*'s description of "punishment" in my opinion in *Lymon*:

> In applying [the "clearest proof"] standard, the Supreme Court first noted that registries were of recent origin, signaling that they were *not* historically regarded as punishment. Further, the Court expressly rejected the argument that registries were analogous to historical forms of "shaming," like standing in the public square or being branded "M" for murderer. The public harm from punishments such as "shaming, humiliation, and banishment" involved "more than the dissemination of information." By contrast, any stigma from modern registries results "not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." Public access to information regarding criminal proceedings is fundamental to the American system. The Supreme Court of the United States spoke clearly: "[O]ur criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." Public and face-to-face confrontation often with corporal elements of the 1700s simply is not an "integral part of the objective" of registries. The fact that publication of a registry is widespread—given that it is distributed on the Internet—and may cause social ostracism or shame from the accurate information it provides does not alter the fact that the scheme is designed and operates to "inform the public for its own safety . . . ."

> As to whether registries impose an affirmative disability or restraint, the Supreme Court noted that the reporting requirements and Internet disclosure of public information did not resemble imprisonment, which is the "paradigmatic affirmative disability or restraint." The registry (which combined certain sex offenses and kidnapping) imposed requirements that were "less harsh than the sanctions of occupational disbarment . . . ." Those on the registry may attend life events, associate with family and friends, join

---

[24] *Id*. at ___; slip op at 2.

associations and local groups, and obtain jobs as they choose; nothing in the registry legally prohibits basic life behaviors or interactions. The Supreme Court noted that while some might argue that registries create a public stigma sufficient to make the offender "completely unemployable," the offender's own actions resulted in a public conviction that could be discovered and considered by private citizens, even without a public registry. "[T]he information about the individual's conviction was already in the public domain." The Supreme Court also noted that there was no indication that any of the reporting requirements were in person. However, it did explain that extensive reporting requirements are an inherent part of the regulatory system and do not support a finding of punishment. Notably, after *Smith*, the federal registry required annual and multiannual in-person reporting, and federal courts, relying on *Smith*'s reasoning, have resoundingly found that such requirements do not constitute an affirmative restraint equivalent to punishment.

Further, the Supreme Court rejected any comparison of registration to probation or supervised release. The latter categories have "a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction," which would reinstitute imprisonment for the initial criminal judgment. By contrast, offenders on the registry may move, work, and go about their lives as they choose, subject to registration and reporting requirements. The reporting requirements might be extensive, but they nonetheless "make a valid regulatory program effective . . . ." The fact that registrants could be criminally charged for a separate crime for not complying with the registry's requirements did not alter the result.

The Supreme Court addressed the aims of the registry and accepted that it serves to deter future crime. But the Court expressly rejected the argument that the registry is therefore punishment. "Any number of governmental programs might deter crime without imposing punishment." Extended registration based on the seriousness of the crime was not indicative of a retributive purpose but instead was "reasonably related to the danger of recidivism" and "consistent with the regulatory objective."

The Supreme Court's analysis on a rational connection to a nonpunitive purpose and excessiveness in relation to that purpose were combined. It explained that a "*rational* connection to a nonpunitive purpose is *a most significant factor*" in determining whether a statute is punitive. Registries have a "legitimate nonpunitive purpose of 'public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y].' " But its application did not require "a close or perfect fit"

9

between the means and ends because imprecision does not make a nonpunitive statute a "sham or mere pretext." The Supreme Court recognized that concerns of recidivism and the offenses those on the registry could commit were legitimate and rational. In so concluding, the Court expressly approved "categorical judgments" for "specified crimes" and expressly rejected the theory that an "individual determination of . . . dangerousness" was required. The public can "assess the risk on the basis of accurate, nonprivate information about the registrants' convictions . . . ." Extensive periods of registration were also rational given the potential for recidivism. The fact that registries are "broadcast" in a universal and "world-wide" manner allowed the registry to *fulfill* its goals of public knowledge and protection. Individuals must take steps to obtain the information, those seeking information are warned that the registry is merely providing public information and that the offenders cannot be subject to criminal actions, and the public is given "available and easily accessible" information.

The Supreme Court explained that the *Mendoza-Martinez* factors considering scienter and whether the behavior is also a crime did not apply to an analysis on registries. The Supreme Court explained: "The regulatory scheme applies only to past conduct, which was, and is, a crime. This is a necessary beginning point, for recidivism is the statutory concern. The obligations the statute imposes are the responsibility of registration, a duty not predicated upon some present or repeated violation." In conclusion, the Supreme Court emphasized that the question is not "whether the legislature has made the best choice possible to address the problem it seeks to remedy" but whether the "regulatory means chosen are reasonable in light of the nonpunitive objective." This was well in line with the accepted standard that requires "clear proof" that the civil statute is so excessive in effect as to imply that the statute is a subterfuge or disguise for criminal punishment.

Thus, the Supreme Court of the United States thoroughly examined the nature and characteristics of an offender registry and concluded that it was not punishment. The precedent is on all fours with registries throughout the country—and specifically registries that are consistent with the federal SORNA. Consequently, SORNA, to which Michigan's current registry is almost *identical*, has been universally held to be nonpunitive.[25]

This analysis is equally relevant to this case.

---

[25] *Id*. at ___; slip op at 11-17, quoting *Smith*, 538 US at 97-105 (citations omitted).

## 2. HISTORY AND TRADITIONS

Contrary to the holding of the majority opinion, the 2021 SORA does not in any meaningful way resemble traditional parole or shaming. SORA is distinct from parole, and the registry's sharing of accurate information regarding registrants with the public is not at all similar to colonial shaming. Therefore, unlike the majority opinion, I would hold that this factor weighs against finding that the 2021 SORA constitutes punishment.

As to parole, the majority opinion applies the "reasoning from *Lymon* [to hold] that the 2021 SORA resembles parole because there is no distinction between the parole-like aspects of the statute as applied to defendants whose crimes contain a sexual element and those whose crimes do not." Just as in *Lymon*, the majority opinion inaccurately equates registration with probation:

> As *Smith* explained, probation involves a government agent immersively *supervising* the offender's behavior, e.g., where the offender may work and what the offender may consume, and the supervisor may revoke the probation and reinstitute imprisonment for the *initial* conviction. The 2021 SORA does not prohibit or place invasive supervision on the permitted behaviors of offenders in a designated government overseer; it merely requires the disclosure of information when the offender chooses to take on certain behaviors, such as relocating their place of residence.[105] The majority opinion [again] does not even acknowledge the difference between supervision and required permissions on one hand and reporting requirements on the other; the assertion that a registrant will interact with the police "more" than a probationer (because the registrant may theoretically change their basic personal information at high frequency) is pure speculation.[106] [26]

_____

[105] *Smith*, 538 US at 101-102 (explaining that intricate reporting requirements did not require the offender to "seek permission" and that revocation depends on the existing criminal offense); [*Shaw v Patton*, 823 F3d 556, 564-566 (CA

_____

[26] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 33-34.

11

10, 2016)] (providing exhaustive historical analysis on probation, noting that it has been accompanied with a specific designated officer who oversees the defendant; it included restrictions and permission for basic actions such as where to live and what to consume, probation searches, and requirements of employment; and it involved "revocation" of a "deferred sentence"); [*Doe v Settle*, 24 F4th 932, 951 (CA 4, 2022)] (explaining that "[h]istorically, a probation officer took a far more active role in a probationer's life than simply collecting information for a database") (quotation marks and citation omitted).

[106] MCL 771.3(1)(c) and (2) (stating that probationers must meet with an officer "monthly or as often as the probation officer requires" and allowing numerous programs and impositions).

_____

As to shaming, the majority opinion holds that the 2021 SORA shames sex offenders because the public can access a breadth of personal information about registrants. Although sex offenders subject to SORA must report information that will be made available to the public, the 2021 SORA does not equate to colonial shaming. As I explained in *Lymon*:

> Like the federal SORNA, which has resoundingly been approved as nonpunitive, the state registry merely serves to provide accurate information to average citizens to make decisions about their lives. This is not hoisting offenders for scorn and abuse in the town square, stitching a scarlet letter on their clothing, or corporal punishment. "Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." The fact that local citizens can remain vigilant and seek out that information (even by purposefully requesting updates) does not equate to colonial "shaming."[96] Any shame and stigma that results is a consequence of the actions of the offender and the convictions (which definitionally result from antisocial and highly concerning behavior), not a system created to inform the public of "accurate information" *from the public record*.[27]

_____

[27] *Id*. at ___; slip op at 29-30, citing *Smith*, 538 US at 98-99 (expressly recognizing that the information can "cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism," but "[o]ur system does not treat

12

_____

[96] Like the registry in *Smith*, the Michigan registry notes that the offenders' information derives from public records and clearly warns those who seek out the information as follows: "Extreme care should be exercised in using any information obtained from this web site. Information on this site must not be used to unlawfully injure, harass, or commit a crime against any individual named in the registry or residing or working at any reported address. Any such action could result in civil or criminal penalties." Michigan State Police, *Michigan Sex Offender Registry* <https://mpsor.com/> (accessed June 24, 2024).

_____

Although the detailed and widespread availability of information through the internet is admittedly "greater than anything which could have been designed in colonial times,"[28] in *Smith*, the Supreme Court determined that the registry advanced the civil interest in public information rather than making the measure punitive. The majority opinion has therefore once again repeated the false and "misleading"[29] claim that registries resemble historical forms of punishment. This factor does not favor a finding that the 2021 SORA constitutes punishment.

### 3. AFFIRMATIVE DISABILITY OR RESTRAINT

I also take issue with the majority opinion's conclusion that the 2021 SORA imposes affirmative disabilities and restraints. The 2021 SORA, like the federal SORNA, does not in any way resemble what has traditionally been understood as a physical restraint, nor does it impose any restrictions or prohibitions on a registrant's daily life and interactions,

_____

dissemination of truthful information in furtherance of a legitimate governmental objective as punishment").

[28] *Smith*, 538 US at 99.

[29] *Id*. at 98.

which have themselves been repeatedly held to be civil.[30] Therefore, this factor weighs against the determination that the 2021 SORA constitutes punishment, contrary to the conclusions reached in the majority opinion.

---

[30] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 35, citing *Smith*, 538 US at 100. See also *Hope v Comm'r of Indiana Dep't of Correction*, 9 F4th 513, 532-533 (CA 7, 2021) (en banc) (holding that the requirements imposed by Indiana's SORA, including physical limitations on life activities, did not approach confinement and did not support a finding of punitive effects through affirmative restraints); *American Civil Liberties Union of Nevada v Masto*, 670 F3d 1046, 1056-1057 (CA 9, 2012) ("The requirement that sex offenders present themselves for fingerprinting is not akin to imprisonment, and the burden remains less onerous than occupational debarment."); *Cutshall v Sundquist*, 193 F3d 466, 474 (CA 6, 1999) (holding that registration was less of an imposition on rights and abilities than revocation of a driver's license); *Shaw*, 823 F3d at 568-570 (collecting significant caselaw on registry requirements, including in-person reporting, and concluding that it is less onerous than a "lifelong bar on work in an industry") (citations omitted).

The majority opinion's attempt to weaken the support provided by these cases lacks merit. *Hope*, in relying on *Smith* and other Supreme Court precedent, stated that it is clear "that very few burdens are significant enough to tip the scale" into making a requirement of a sex-offender-registration statute a restraint or disability. *Hope*, 9 F4th at 532. Then, without analyzing the requirements of the Indiana SORA at issue, *Hope* held "that to the extent that [the Indiana] SORA's obligations amount to restraints or disabilities, standing alone they are not sufficiently severe in view of Supreme Court precedent to make [the Indiana] SORA punitive." *Id*. at 533.

*Cutshall* also supports a determination that the 2021 SORA does not impose an affirmative disability or restraint. The Tennessee sex-offender-registration scheme at issue in *Cutshall* is similar to the 2021 SORA in that, under both statutes, a registrant is required to report "where he lives, where he works, and other basic data." *Cutshall*, 193 F3d at 474. Also, registrants are "free to live where [they] choose[], come and go as [they] please[], and seek any employment" they wish. *Id*.

The majority opinion states that although "other federal courts have concluded that sex-offender registries do not impose affirmative disabilities or restraints, as in [*Masto*, 670 F3d at 1056-1057], we also note that our previous decision in *Lymon* that the 2021 SORA does impose affirmative disabilities and restraints is binding precedent that this Court must follow." However, the majority opinion fails to recognize that *Lymon* is not controlling in this case because *Lymon* did not deal with offenders who had been convicted of a sex crime.

By holding that the 2021 SORA is an affirmative disability or restraint, the majority opinion distinguishes this case from *Smith*, which held that Alaska's registry was not a restraint because Alaska's SORA did not require any in-person reporting. However, periodic in-person reporting is a basic part of the federal SORNA, which was enacted *after* the Supreme Court held in *Smith* that Alaska's registry was not punishment.[31] The majority opinion also cites the " 'rising and pervasive influence of the Internet since the *Smith* decision.' "[32] But it offers no explanation why increased internet usage since the issuance of *Smith* renders *Smith*'s holding null. Registrants may have to report frequently because registrants are required to disclose all of their "internet identifiers."[33] However, as the majority opinion points out, updates to internet identifiers can be reported by *mail* as well as in person.[34] And although, due to "[t]he ease of use of the public website," Michigan's sex-offender registry may be viewed by more people than the Alaska registry that was available at the time that *Smith* was decided, the Alaska registry at issue in *Smith* was still open to the public, like the current Michigan registry. Accordingly, the reasoning offered in the majority opinion that effectively ignores the binding precedent of *Smith* is entirely unpersuasive.

---

[31] See Department of Justice, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *SORNA In Person Registration Requirements* <https://smart.ojp.gov/sorna/current-law/implementation-documents/person-verification> (accessed July 3, 2025) [https://perma.cc/Y4YT-J3V7].

[32] Quoting *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 17.

[33] MCL 28.725(2)(a).

[34] See MCL 28.725(2).

Moreover, "[r]egistrants 'are free to move where they wish and to live and work as other citizens,' and the reporting is not remotely similar to 'the paradigmatic affirmative disability or restraint' " of imprisonment.[35] Registries provide a *truthful* and *public* record. " '[A]ccurate, nonprivate information about the registrants' convictions' in a public trial and court of law is not an affirmative restraint sufficient to override the Legislature's choices."[36] Simply stated, this type of registration does not amount to an affirmative disability or restraint.

## 4. TRADITIONAL AIMS OF PUNISHMENT

The "traditional aims of punishment" factor does not support a finding that the 2021 SORA is punishment, contrary to the reasoning of the majority opinion. This factor looks at whether the 2021 SORA promotes the traditional aims of punishment: deterrence and retribution.[37] Although the 2021 SORA may deter registered sex offenders from reoffending, that does not render the registry punitive in nature. "Any number of governmental programs might deter crime without imposing punishment."[38] The effect of publishing information for public use is to provide individuals with knowledge to direct their life choices and prevent abuse and violence. In so doing, the primary design of the registry to enhance public safety is advanced.

---

[35] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 34, quoting *Smith*, 538 US at 100-101.

[36] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 37, quoting *Smith*, 538 US at 104.

[37] See *Earl*, 495 Mich at 46.

[38] *Smith*, 538 US at 102.

Moreover, there is no merit in the majority opinion's claim that a public registry of convictions amounts to retribution. The primary objective of the registry is to provide public information about persons who have been convicted of sex offenses to allow the public to " 'take the precautions they deem necessary' " in response to a registrant's proven criminal behavior.[39] Publishing information on categories of crime is " 'reasonably related' " to the regulatory objective; it is not society's retribution for the crime itself.[40] Thus, the 2021 SORA does not promote the traditional aims of punishment.

## 5. CONNECTION TO NONPUNITIVE PURPOSE

I agree with the majority opinion's holding that this factor supports a finding that the 2021 SORA is a civil remedy because the 2021 SORA has a rational connection to the nonpunitive purpose of "assist[ing] law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders."[41] Importantly, as explained by the Supreme Court of the United States, this is the "*most significant factor*" in the determination that a statute's effects are not punitive.[42]

---

[39] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 37, quoting *Smith*, 538 US at 101.

[40] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 37, quoting *Smith*, 538 US at 102, 105 (noting that *Smith* explained that the registry's application to criminal conduct was of "little weight" given the interest in protecting the public from the offender's future conduct).

[41] MCL 28.721a.

[42] *Smith*, 538 US at 102 (quotation marks, citation, and brackets omitted; emphasis added).

## 6. EXCESSIVENESS

We next must consider whether the 2021 SORA is excessive as applied to sexual offenders. "This *Mendoza-Martinez* factor requires the Legislature to have made a 'reasonable' choice; it does not require the Legislature to have 'made the best choice possible to address the problem it seeks to remedy.' "[43] As described in *Lymon*, " 'The Legislature's asserted nonpunitive goal was based on the Legislature's determination that "a person who has been convicted of committing an offense covered by [SORA] poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." MCL 28.721a.' "[44] This Court must therefore determine whether the 2021 SORA is a *reasonable* means of protecting the public from the " 'commission of future criminal sexual acts' "[45] by *sexual* offenders like defendant. The only logical answer to that question is yes.

As the majority opinion explains:

> [I]n *Betts*, our determination that the 2011 SORA was excessive relied, in part, on the exclusionary "student-safety zones" that restricted where registrants could live, work, and loiter. *Betts*, 507 Mich at 550-551, 554-555, 561-562. These location restrictions were removed from SORA by the 2021 amendments. *Lymon*, ___ Mich at ___; slip op at 12-14. In *Lymon*, our finding that the 2021 SORA was excessive as applied to nonsexual offenders centered on the fact that "[s]uch offenders are branded dangerous sex offenders even though their crimes contained no sexual component and even

---

[43] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 24, quoting *Smith*, 538 US at 105.

[44] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 24, quoting *Betts*, 507 Mich at 559 (alteration in *Betts*).

[45] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 24, quoting MCL 28.721a.

18

though there has been no determination that they pose such a risk of harm to the community." *Id*. at ___; slip op at 26.

This case is substantially different from *Lymon*, where we addressed the application of the 2021 SORA to offenders whose crimes lack a sexual component. This case involves offenders whose crimes *contain* a sexual component and offenders for whom "there has been [a] determination that they pose such a risk of harm [i.e., the commission of sexual offenses] to the community."[46] Defendant was found guilty of committing CSC-I against his five-year-old daughter. Nonetheless, the majority opinion concludes "that multiple aspects of the 2021 SORA are excessive to its stated public-safety purpose," rendering this factor "in favor of the conclusion that the act is punishment." One cannot reasonably think that requiring a dangerous predator like defendant to register and comply with SORA's requirements is excessive and does not *reasonably advance* the state's nonpunitive interest.

Because we are now dealing exclusively with *sexual offenders*, the entire basis for the majority's conclusion in *Lymon* is inapplicable and irrelevant to this case. Moreover, this Court is not in a position to correctly determine or opine on the efficacy of SORA, and any action to the contrary usurps the constitutional power assigned to the Legislature. This is yet another example of this Court seeking to achieve by the exercise of judicial power that which is the prerogative of the Legislature.[47]

---

[46] *Lymon*, ___ Mich at ___ (opinion of the Court); slip op at 26.

[47] See *People v Parks*, 510 Mich 225, 268; 987 NW2d 161 (2022) (holding "that mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life without parole violates the principle of proportionality derived from the Michigan Constitution"); see also *People v Taylor*, ___ Mich ___; ___ NW3d ___ (April 10, 2025) (Docket No. 166428) (applying similar reasoning to 19- and 20-year-olds).

In forging ahead, the majority opinion first finds the tiering component of the 2021 SORA to be excessive because it has determined that there is an inverse relationship between the current tiers and risk. Specifically, the majority opinion states that " 'Tier I [offenders] have the highest risk scores, Tier II the next highest, and Tier III the lowest.' " (Citation omitted.) In making this broad proclamation, the majority opinion merely purports to rely on one study that fails to address that some Tier III offenders have lower recidivism rates because they are imprisoned for decades or life, not because they are less dangerous. Moreover, it is illogical to broadly conclude that Tier III offenders, such as defendant, who committed CSC-I against his five-year-old daughter, have a low risk of reoffending, whereas Tier I offenders, who were convicted of less serious sex crimes, have a high risk of reoffending. In any event, to the extent that such matters are open to debate, it is within the province of the Legislature to conclude that Tier III offenders are subject to the most stringent SORA requirements because they pose the highest risk to the community due to the fact that they have committed the most heinous sex crimes. In my view, it is not proper and it is beyond the realm of this Court's expertise to compare and assess the danger that Tier I versus Tier III offenders pose to the community. SORA's requirements as applied to these individuals are not excessive but a *reasonable* means of protecting the public.

Next, the majority opinion discusses the publication of extensive personal information on the public SORA website and recognizes "that there is a rational purpose for disseminating this information to the public with greater ease than information about other types of crimes." But the majority opinion fails to recognize that the website is rational as applied to offenders convicted of sexual offenses. The SORA website is not

20

"overinclusive" or "detrimental to the goal of public safety." In *Lymon*, the Court invalidated SORA as applied to nonsexual offenders. Therefore, SORA's requirements apply *only* to sexual offenders. Moreover, offenders who have committed less serious sex crimes, i.e., Tier I and Tier II offenders, are not required to register under SORA for life and instead must only register for a term of years. This reflects the Legislature's rational conclusion that certain offenders pose less of a danger to the public than Tier III offenders. SORA, and its publication of offender information, is now limited to offenders who have been convicted of the most dangerous sex crimes. Again, this is not excessive, but a *reasonable* means of protecting the public.

Finally, the majority opinion takes issue with the duration of SORA's reporting requirements and the lack of opportunity to petition for removal. Only Tier III offenders (those who have been convicted of the most heinous and violent sex crimes) are required to register for life under SORA. These offenders pose the highest risk of danger to the community. Registrants who have committed less serious crimes are required to register only for a term of years. Moreover, the majority opinion fails to recognize that there are opportunities to petition for SORA removal.[48] Accordingly, it is not excessive that the Legislature directed the most dangerous subset of sex offenders to comply with SORA for life. Rather, it is a *reasonable* means of protecting the public.

The majority opinion's determination that the 2021 SORA is excessive runs contrary to the determination made by the Supreme Court of the United States in *Smith*, as I explained in *Lymon*:

---

[48] Tier III offenders are subject to lifetime SORA registration, MCL 28.725(13), unless they successfully petition for removal under MCL 28.728c(13), (14), or (15).

21

The Supreme Court recognized that concerns of recidivism and the offenses those on the registry could commit were legitimate and rational. In so concluding, the Court expressly approved "categorical judgments" for "specified crimes" and expressly rejected the theory that an "individual determination of . . . dangerousness" was required. The public can "assess the risk on the basis of accurate, nonprivate information about the registrants' convictions . . . ." Extensive periods of registration were also rational given the potential for recidivism. The fact that registries are "broadcast" in a universal and "world-wide" manner allowed the registry to *fulfill* its goals of public knowledge and protection. Individuals must take steps to obtain the information, those seeking information are warned that the registry is merely providing public information and that the offenders cannot be subject to criminal actions, and the public is given "available and easily accessible" information.[49]

The registry merely provides *accurate* information on the offender's *public* convictions. Publishing this information advances the strong public interest in ensuring the safety of children from significantly underreported yet heinous crimes, as well as the profound interest in entrusting citizens with knowledge to make their own life decisions. The majority opinion is entirely inconsistent with *Smith* and the courts that have reviewed SORNA and concluded that registry reporting requirements are not extreme or excessive.[50] For these reasons, I disagree with the majority opinion that multiple aspects of the 2021 SORA are excessive to its stated public-safety purpose.

---

[49] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 15-16, quoting *Smith*, 538 US at 103-105.

[50] See, for example, *United States v Young*, 585 F3d 199, 206 (CA 5, 2009); *United States v Hinckley*, 550 F3d 926, 937-938 (CA 10, 2008). The Supreme Court affirmed the application of SORNA, which included in-person reporting, to military offenses under a similar analysis to *Smith* in *United States v Kebodeaux*, 570 US 387, 395; 133 S Ct 2496; 186 L Ed 2d 540 (2013) (holding that the imposition of a "civil requirement" of registration was "eminently reasonable").

## 7. PUNITIVE EFFECTS AS A WHOLE

I disagree with the majority opinion's holding "that defendant has met his burden to show by 'the clearest proof' that the 2021 SORA 'is so punitive either in purpose or effect as to negate the State's intention to deem it civil[.]' " (Citation omitted.)  As I explained in *Lymon*:

> This Court's policy preferences are not any more "reasonable" than those of the democratically elected legislatures of almost every American jurisdiction, and there is nowhere near the "clearest proof" of irrationality so as to make them a "sham" or "disguised punishment," as is required under well-accepted law to declare a statute punitive notwithstanding the Legislature's intent.  The reasoning in the majority opinion . . . nullifies the work of the Legislature and elevates the policy choices of this Court.

> Contrary to the analysis in the majority opinion and in line with the thorough analysis in *Smith*, consideration of the *Mendoza-Martinez* factors decisively leads to the conclusion that the extraordinary burden of proving SORA is a "sham" or "disguised" punishment has not been met.  Review of historical forms of punishment, the existence of affirmative restraints, promotion of traditional methods of punishment, and reasonable advancement of a nonpenological objective all together lead to the conclusion that SORA is a valid civil measure for public knowledge and protection, in accordance with the Legislature's intent.[51]

---

[51] *Lymon*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 44-45 (citations omitted).  At this point in my *Lymon* dissent, I stated that "[t]he legally unjustified holding that SORA is punitive has major consequences, and it is difficult to see how today's holding can be limited 'just' to offenders such as those" whose crimes lacked a sexual component.  *Id*. at ___ n 135; slip op at 45 n 135.  Unfortunately, I was correct in predicting that this Court's unjustified holding would lead to a broader range of consequences for this state.  My concerns about *Lymon*'s holding were justified and not premature.  Just one year later, this Court now holds that the 2021 SORA is punitive as applied to offenders whose crimes contain a sexual component.  *Lymon* laid the foundation for this holding, which is even less justified than *Lymon*'s holding.

23

Requiring SORA registration for sexual offenders like defendant, who committed CSC-I against his five-year-old daughter, reasonably advances a rational, nonpunitive purpose—the goal of public knowledge and protection.

For all of these reasons, I dissent from the majority opinion's holding that registration for sexual offenders as required by the 2021 SORA is punishment.

## B. THE 2021 SORA IS NOT CRUEL OR UNUSUAL

Because I would hold that the 2021 SORA is not punishment, I would not address whether it is cruel or unusual. Nonetheless, I agree with the majority opinion in concluding that the 2021 SORA is not cruel or unusual punishment. Allowing the public to access accurate information concerning a convicted sex offender's offenses, with occasional reporting requirements that impose no restrictions on that offender's residence, employment, behaviors, or associations, simply is not cruel or unusual punishment as prohibited under the federal and Michigan Constitutions. Defendant sexually assaulted his five-year-old daughter. Given the heinousness of the crime, the fact that those who have sexually abused children have established a tendency to commit abuse, the potential harm if those offenders commit a subsequent child-abuse offense, and the fact that child abuse generally is very underreported, providing the public with basic information on convicted sex offenders like defendant does not equate to the "rare" and "extreme" case in which the sentence is "grossly disproportionate" to the crime.[52] Further, the Supreme Court of the

---

[52] *Id*. at ___; slip op at 47, quoting *Hutto v Davis*, 454 US 370, 374; 102 S Ct 703; 70 L Ed 2d 556 (1982) (noting that *Hutto* explained that cruel and unusual punishments, given deference to legislatures, are "exceedingly rare") (quotation marks omitted), and *Ewing v California*, 538 US 11, 23; 123 S Ct 1179; 155 L Ed 2d 108 (2003) (plurality opinion) (explaining that the Eighth Amendment does not require "strict proportionality" and

United States has explicitly held that the lack of an "individualized" risk assessment is not relevant to the inquiry.[53]

To determine whether a punishment is "grossly disproportionate," we consider the factors from the *Lorentzen*[54] test, as affirmed in *Bullock*: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) "policy factors underlying criminal penalties," such as rehabilitation and deterrence.[55] Although I join in the majority opinion's holding that the 2021 SORA is not cruel or unusual as applied to sexual offenders, I disagree with its analysis of the *Lorentzen* factors.

More specifically, I agree that Factor (1), the harshness of the penalty compared to the gravity of the offense, favors proportionality. I nonetheless disagree that "the excessiveness of SORA's reporting requirements may increase over time, such as for Tier III offenders who have lived offense-free for decades." Further, it is disconcerting that the Court's majority concedes that defendant "has not presented evidence of his individual risk of reoffending." Defendant demonstrated his risk of reoffending by sexually assaulting his five-year-old daughter.

Consistent with the holding of the majority opinion, I also conclude that Factor (2), the penalty imposed for the offense compared to other offenses, favors proportionality.

_____

"forbids only extreme sentences that are grossly disproportionate to the crime") (quotation marks and citation omitted).

[53] See *Harmelin v Michigan*, 501 US 957, 995; 111 S Ct 2680; 115 L Ed 2d 836 (1991).

[54] *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972).

[55] *Bullock*, 440 Mich at 33-34; *Lorentzen*, 387 Mich at 176-181.

25

Unlike the Court's majority, I do not conclude that the 2021 SORA's tiering system is excessive. Sentences must be proportional to the crime committed. A tiering system is consistent with proportionality. It is not excessive that the Legislature has required the most serious sexual offenders to be subject to the most stringent requirements.

The majority opinion properly concludes that Factor (3) favors proportionality. This factor compares the penalty imposed for the offense in Michigan to the penalty imposed in other states. The majority opinion, however, goes astray in its Factor (3) analysis when it observes that "Michigan is . . . among a minority of states that (1) require lifetime registration, (2) do not use a risk assessment, and (3) do not have any mechanism for most lifetime registrants to petition for removal."[56] This characterization of SORA's registration requirements is misleading and inaccurate. In fact, every state and the federal government require *at least* some subset of sex offenders to register for life.[57] Also, there *is* a mechanism under SORA for lifetime registrants to petition for removal *if* the requirements are met.[58] Therefore, lifetime SORA registration for defendant, and defendants who

---

[56] The majority opinion points out that a minority of states use a risk assessment for their registration or notification systems. Just because a minority of states use a risk assessment does not mean that this state must do so. It is up to the Legislature, not this Court, to require a "risk assessment."

[57] See Restoration of Rights Project, *50-State Comparison: Relief from Sex Offense Registration Obligations* <https://ccresourcecenter.org/state-restoration-profiles/50-state-comparison-relief-from-sex-offender-registration-obligations> (accessed December 16, 2025) [https://perma.cc/YMF4-PFUP].

[58] Lifetime registrants are classified as Tier III offenders under SORA. MCL 28.725(13). Tier III offenders are subject to lifetime SORA registration unless they successfully petition for removal under MCL 28.728c(13), (14), or (15).

similarly committed a Tier III offense, is proportionate for the offense compared to other states.

Finally, although I agree that Factor (4), whether the penalty imposed advances the goals of rehabilitation, favors a finding of disproportionality, I disagree with the notion that

> the publication of registry information may actually have a dampening effect on the general deterrent value that sex-offender registries can have. SORA also fails to account for individualized levels of risk, which cuts against an argument for specific deterrence. And any need for continued incapacitation should be taken into account in the parole process when individualized determinations of public safety are made prior to release.

Simply put, SORA does account for individualized levels of risk: The most dangerous convicted sex offenders are subject to the most serious reporting requirements. Moreover, SORA's publication of offender information does not encourage a sexual predator to offend. If anything, it does the opposite and deters these predators from offending to prevent their personal information from being published on a list of dangerous offenders.

## III. CONCLUSION

I dissent from the conclusion reached in the majority opinion that the 2021 SORA is punishment as applied to sexual offenders. Defendant has woefully failed to meet his burden to show by "the clearest proof" that the 2021 SORA " 'is so punitive either in purpose or effect as to negate the State's intention to deem it civil.' " For these reasons, I would not address the question whether SORA is cruel or unusual under Michigan's Constitution. But because the majority opinion addresses this question, I concur in its conclusion that the 2021 SORA is not cruel or unusual punishment. I would affirm the judgment of the Court of Appeals as to defendant's challenge to SORA but vacate its opinion to the extent that it held that the 2021 SORA was punishment as applied to

27

offenders whose crimes contain a sexual component. I also agree with the majority opinion in denying leave to appeal on defendant's claims regarding LEM.

In sum, today's decision erodes the safety and well-being of Michigan families. The Court has made its constitutional declaration at the expense of the power traditionally assigned to the legislative and executive branches of government. Because I defer to the policy choices of our Legislature and do not believe that the exercise of judicial power invoked in this matter is justified, I dissent.


Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                            No. 165008

ROBERT JAMES KARDASZ,

      Defendant-Appellant.

_____

BERNSTEIN, J. (*concurring in part and dissenting in part*).

I concur with the majority's opinion, save for one notable distinction. Defendant challenges the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, as amended by 2020 PA 295 (the 2021 SORA), arguing that the registration requirements imposed under the 2021 SORA amounted to cruel or unusual punishment in violation of Article 1, § 16, of Michigan's 1963 Constitution. I would have simply assumed without deciding that the 2021 SORA is punishment, given that any punishment here is not cruel or unusual. Accordingly, I dissent from Part III(B) of the majority opinion.

                                   Richard H. Bernstein